## THE W. G. MASON.

## THE W. I. BABCOCK.

### (Circuit Court of Appeals, Second Circuit. December 5, 1905.

### No. 21.

**1. TOWAGE—STRANDING OF TOW—LIABILITY OF TUGS.**

Where a steamship being towed by two tugs from her dock through a narrow channel with which she was unacquainted promptly obeyed all orders of the tugs, the burden of proof rests upon them to show that they exercised due care, and, unless such burden is met, liability for her stranding rests on one or both.

[Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Towage, § 34.]

**2. SAME—JOINT SERVICE BY TWO TUGS—LIABILITY OF ONE FOR FAULT OF THE OTHER.**

Two tugs belonging to the same owner were engaged in towing a steamship under a contract made with such owner. The master of the leading tug directed the movements of the ship, but as to her own movements the tug behind was under control of her own master. *Held*, that the rear tug was not liable in rem for the stranding of the tow, which occurred solely through the fault of the leading tug.

Appeal from the District Court of the United States for the Western District of New York.

For opinion below, see 131 Fed. 632.

H. A. Kelley, for appellant.

H. D. Goulder, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

WALLACE, Circuit Judge. The decree appealed from adjudged that the steam tugs, the Mason and the Babcock, were liable in rem for the damages sustained by the steamship Gratwick in consequence of her being stranded upon the rocks in the channel leading from the port of Buffalo to Lake Erie through the negligence of the tugs while they were engaged in towing her. Two questions are presented by the appeal: First, whether the tugs, or either of them, were guilty of any negligence in performing the towage service; and, second, assuming that the stranding was caused by the negligence of the tug Mason, there being no fault on the part of the tug Babcock, whether the latter is also liable in rem.

The facts of the case are fully stated in the opinion of the district judge (131 Fed. 632), and need not be recapitulated in detail. The salient facts are these: The steamship was taken in tow by two tugs at the dock where she lay at the port of Buffalo under an engagement to take her into Lake Erie through the somewhat difficult channel around the breakwater at Erie Basin; the Mason taking her headline and the Babcock her sternline. Coming from the dock her proper course required that she should be taken ahead for a short distance, then turned at practically a right angle to starboard, and after proceeding upon that course a few hundred feet, and reaching the northerly end of the breakwater, that she be turned around the end at nearly a right angle to port; the route being through a narrow unmarked

channel, with shoals on either side, and with currents varying under varying conditions of the wind. No fault on the part of the tugs or of the steamer is suggested until the attempt was made to turn her to port around the end of the breakwater, where a strong current was encountered. When the Gratwick reached the end of the breakwater, her engines had been stopped pursuant to the orders of the Mason, and she was then directed by a signal from the Mason, being one blast followed by four, to go ahead strong. The testimony of her witnesses is that the Gratwick promptly complied with that order. The testimony for the tugs is that she did not comply, and that because of her non-compliance the Babcock immediately gave her a similar signal, without avail. Although the Mason had succeeded in pulling her bow to port, and the Babcock in pushing her stern to starboard, sufficiently to clear the end of the breakwater and head her on her proper course, she was not turned quickly enough to resist the current, and was carried upon the rocks upon the opposite side of the channel.

The vital question is whether she complied with the first order, because, if she did, promptly and fully, she is not in fault for the disaster; and, if she did not, the disaster cannot be imputed to the fault of the tugs. Upon this question there is a sharp issue of veracity between the witnesses; and as they were examined in the presence of the district judge his finding should not be disturbed, unless the rule which ordinarily prevails in the review of an admiralty cause should not, for some exceptional reason, be applied. His finding is emphatic and unequivocal in favor of the Gratwick. We have scrutinized the record with care; and if we were required to decide the question as an original one, to be determined by weighing the statements of the witnesses and giving them their relative value, we should decide it as he did. The theory that the Gratwick mistook the first signal of the Mason, and the alleged subsequent signals, as signals "back and forth between the tugs," and not as signals to herself, cannot be accepted in view of the testimony of her master, who was in the pilot house directing her movements, of Boyer, who was by his side, of the second mate, and of the wheelsman, giving but very little, if any, weight to the testimony of Harris.

It is not fairly disputable that the tugs were in control of the navigation of the tow, and that the only obligation of the tow was to conform her own navigation to the movements of the tugs, so as to assist them as far as it was practicable to do so, and in this behalf to exercise proper diligence and efficiency in obeying the directions of the Mason, whose master from the beginning of the towage service assumed to give the required signals.

The towage service was to be performed in part in a channel where thorough acquaintance with the conformation and boundaries, effects of the currents, and the location of the submerged rocks, was of the utmost importance, and where a slight deviation in point of time or speed on the part of the steamship would have been liable to frustrate the efforts of the tugs. The conditions were such that it would have been imprudent for the steamer to take the initiative, at a critical moment, in starting her engines at full speed ahead without waiting for

an order from the tug; and the testimony offered by the tugs to show that it is ordinarily the practice for a steamer in tow of tugs to do this, if it bears with any pertinency upon the customary management of a tow in the situation of the Gratwick, only tends to prove a practice which would be pernicious and reprehensible.

Although there was no testimony introduced by the libelant to indicate precisely what fault of the tugs caused the misfortune, the case was tried on behalf of the tugs upon the theory that the stranding was occasioned by the Gratwick's disregard of orders. Whether the district judge was right in the conclusion that the cause of the misfortune was the omission of the master of the Mason to give in timely season the order to the tow to "go ahead strong" as she neared the end of the breakwater, or whether it was some other omission or fault on the part of the Mason, need not be particularly considered, though this would seem to be the reasonable deduction from the circumstances. It suffices that the misfortune occurred without any fault on the part of the tow, or on the part of the Babcock, and under a state of circumstances in which, if proper care is exercised in performing a similar service, such misfortune does not ordinarily occur. This was enough to impose upon the tugs the burden of proof to show that they had exercised due care. Rose v. Stephens & Condit Co., 20 Blatchf. 411, 11 Fed. 438; Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270. This court has had frequent occasion to apply this doctrine in similar cases; the latest being the case of The Genessee (C. C. A.) 138 Fed. 549.

The proof offered by the tugs did not afford any explanation of the causes of the disaster, aside from the alleged disregard of orders by the tow. No unforseen difficulties were encountered, and no obstacle which the tugs were not bound to anticipate. The case is one where the stranding of the steamer created a presumption of negligence. The Webb, 14 Wall. 406, 20 L. Ed. 774; The Kalikaska, 107 Fed. 959, 47 C. C. A. 100. As the proof did show that the Babcock properly performed her part of the service, the responsibility for the disaster must rest on the Mason alone.

The question raised by the appeal, whether the Babcock is liable in rem, although she was not herself in fault, is one upon which there are few adjudications in point. If the Babcock is not liable, the bond given by her owner in limitation of her liability should be discharged, and the recovery can only be enforced as against the bond given in limitation of the Mason's liability, and the libelant's loss to the extent of about $5,000 cannot be satisfied. Both tugs were owned by the same corporation; and the contract of towage was made between the master of the Gratwick and the corporation. The master of the Gratwick did not select the tugs or indicate the details of the employment, and the part which each should take in performing the joint enterprise to which they were assigned by their owner was arranged either by the owner or by the masters of the tugs. The evidence indicates that the Mason as the pilot tug was expected to, and did, take the initiative in directing the movements of the Gratwick, but that in other respects the navigation of the Babcock was exclusively under the con-

trol of her own master, and, although the tugs were co-operating in the same general undertaking, each was acting independently of the other in doing her own part of the work.

The authorities cited in the opinion of the court below, and upon the argument at bar, are The Arturo (D. C.) 6 Fed. 308; The Bordentown (D. C.) 40 Fed. 683; The Columbia, 73 Fed. 226, 19 C. C. A. 91; and Van Eyken v. Erie R. Co. (D. C.) 117 Fed. 717.

The Arturo was a case in which two tugs, belonging to different owners, while performing a towage service, stranded the tow upon a shoal; both tugs being in command of the master of one of the tugs. The decision was that both were liable because both were in fault. Judge Lowell in his opinion, after stating that, if one tug was wholly in fault, she alone would be responsible, says:

"But for their joint action, so far as it conduced to the loss, I hold them to be jointly responsible."

The Bordentown was a case in which Judge Brown held both the Bordentown and the Winnie, tugs engaged in a towage service, liable for the fault of the master of the Bordentown. Both tugs were owned by the same owner, and the master of the Bordentown was in command of both. Judge Brown said:

"At the time when the master's fault arose the Winnie was as much a part of the moving power as the Bordentown, and was equally under the same direction. She belonged to the same owners, and from the beginning to the end she was engaged, in the owner's behalf, in the work of towing the other boats, precisely as the Bordentown was engaged. It was immaterial on board which tug the master for the time being was, or from which boat his orders were given. Both as related to the owners of the tugs, and as related to the owners of the boats in tow, the Bordentown and the Winnie, in taking the tow through the Kills, were in effect one vessel."

In The Columbia it was held that, where the owner of a barge which had no motive power had undertaken to transport freight upon the barge, such barge and a tug, belonging to the same owner, by which the motive power was supplied, became one vessel for the purposes of the voyage, and that the owner was not entitled to limit his liability for damages caused by the negligence of the crew of either craft, without surrendering both.

Van Eyken v. Erie R. Co. was an action in personam to recover damages to the steamship Folmina from a collision between that vessel and the tug Shohola, which occurred in consequence of the breaking down of the tug's machinery while she was towing a barge. The tug and the barge were lashed together, and were both owned by the respondent, and the question arose whether the owner in limitation of liability was obliged to surrender the barge, as well as the tow. The court in its opinion (Judge Thomas) repudiated the argument that both were liable because both "formed a common united instrument of commerce, moving as an entirety, when the tort was committed," and held that, as the cause of the injury was the disordered steering-gear of the tug, the tug alone was liable, and the respondent was therefore entitled to limit his liability on surrendering the tug alone.

It will be observed that of these adjudications only two (The Bordentown and The Columbia) decide the question now presented;

while in the other two, notwithstanding the master of the offending tug was in command of the other vessel sought to be held, exonerated that vessel. It will also be observed that in the two cases in which the vessel not in fault was exonerated, in one of them she was without motive power and was lashed to the offending tug, and in the other she was a tug engaged jointly with the offending tug in performing the towage service. In The Bordentown it was said not to be enough that both vessels were under the command of the same master, and in The Columbia the fact that each was under command of her own master was treated as immaterial.

Does the fact that both vessels belonged to the same owner affect the question of liability in rem? If it does, it can only be because liability in rem is coextensive with the personal liability of the owner. This may be the law in England, but it is not the law in this country as declared by the highest courts.

In United States v. Brig Malek Adhel, 2 How. 210, 11 L. Ed. 239, the question arose whether under an act of Congress authorizing the seizure and condemnation by a court of admiralty of a vessel for an act of piracy the innocence of the owner withdrew the vessel from the penalty of confiscation, and the court in its opinion, after observing that the act made no exception, proceeded to show that it was consistent with the general doctrine of courts of admiralty to condemn the vessel for a wrong or tort without regard to the personal responsibility of her owner. Mr. Justice Story said:

"Nor is there anything new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offense has been done as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof."

In The China, 7 Wall. 53, 19 L. Ed. 67, the liability of the vessel in rem for the act of a compulsory pilot was placed upon the ground that the responsibility of the vessel for torts committed by it was not derived from the law of master and servant, or from the common law at all, but from maritime law, which impresses a maritime lien upon the vessel in whosesoever hands it may be for the torts committed by it. In that case the vessel was held liable in rem, although, upon similar facts, as the court subsequently held in Homer Ramsdell Co. v. Comp. Gen. Trans., 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155, the owner would not have been liable in personam.

In Ralli v. Troop, 157 U. S. 386, 403, 15 Sup. Ct. 657, 663, 39 L. Ed. 742, the court, in commenting on The China, approved the language of counsel in the argument of that case:

"This theory treats the faults or conduct of the vessel as imputable to the vessel itself, and discards as immaterial all considerations touching the adjustment among navigators, or between them and the owners, of the personal fault or personal responsibility of the misgovernment of the vessel."

In Workman v. New York City, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314, the court again declared the doctrine that a ship by whomsoever owned or navigated is liable for the negligence of her master or crew.

In The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954, the opinion states that the decision in The China went upon the principle of treating the vessel "in which or by which, or by the master or crew thereof, a wrong or offense has been committed, as the offender, without any regard whatsoever to the personal misconduct of the personal responsibility of the owner thereof"; thus reiterating the language of Mr. Justice Story in United States v. Brig Malek Adhel, 2 How. 210, 233, 11 L. Ed. 239.

If, as these authorities assert, the personal liability of the owner is not an element in determining the liability of a vessel in rem for wrongs or torts, the decisions in The Bordentown and The Columbia, so far as they were based upon the contrary consideration, were erroneous. The observations in those cases, to the effect that the two vessels were to be regarded as one for the purposes of the joint undertaking, have not the remotest bearing upon the question of their respective liabilities in rem. A tug and her tow are deemed a single vessel under steam, within the meaning of the rules of navigation for preventing collisions; but it has never been asserted elsewhere that they could be regarded as one vessel for the purpose of ascertaining their relations as between themselves, or their several liabilities to respond for the consequences of a fault of one of them. Even when two vessels are lashed together, the question of the liability of each always depends upon ascertaining whether that vessel was in fault. The James Gray v. The John Frazer, 21 How. 184, 16 L. Ed. 106; Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591; The Carrie L. Tyler, 106 Fed. 422, 45 C. C. A. 374, 54 L. R. A. 236.

The cause of action here is not one for the breach of a maritime contract of towage; but it is for the breach of a duty imposed by the law, independently of contract or consideration, and is therefore founded in tort. The Quickstep, 9 Wall. 665, 19 L. Ed. 767; The Syracuse, 12 Wall. 167, 20 L. Ed. 382. In The John G. Stephens, 170 U. S. 125, 18 Sup. Ct. 549, 42 L. Ed. 969, the Supreme Court said:

"This court, more than once, has directly affirmed that a suit by the owner of a tow against her tug to recover for an injury to the tow for negligence on the part of the tug is a suit ex delicto and not ex contractu."

And, as was further said in that opinion:

"The owner of the injured vessel is entitled to proceed against the offender, without regard to the question who may be her owners, or to the divisions, the nature or the extent of their interest in her."

If the liability of the owner for the tort or wrong of a vessel, arising from the misconduct or negligence of her master or crew, could be enforced against another vessel belonging to the same owner, whenever she might happen to be engaged in the same enterprise with the other vessel, though acting in an independent capacity, and under the control of her own master and crew, in performing her part of it, the spirit and meaning of the statute limiting the liabilities of vessel owners would be disregarded. The statute incorporates into the law of this country the rule of liability which was administered as a part of the general maritime law by the courts of continental Europe, and was adopted in England by the acts of 26 and 53 George III, and by which

the liability of the owner for all torts of the master and seamen in charge of the navigation of his ship was limited to the value of his ship and freight.  For the promotion of commerce, and to protect those who invest their money in ships from hazard of losing the rest of their property through the fault of those to whom they are obliged to intrust the navigation, the statute limits their liability for the faults of navigation of a particular ship to the amount invested in that ship, provided they have not had any personal participation in these faults.  "It limits the shipowner's liability in three classes of damage or wrong happening without their privity, and by the fault or neglect of the master or other person on board." Norwich Co. v. Wright, 13 Wall. 104, 121, 20 L. Ed. 585.  To subject both vessels in a case like the present to liability in rem would make the owner responsible for a fault committed without his privity or knowledge beyond the value of the ship in fault.

The views we have expressed lead to a reversal of the decree of the court below.  It is accordingly reversed, with costs of the appeal, and with instructions to decree conformably to this opinion.