## THE MARY J. KENNEDY.

(District Court, E. D. New York. April 30, 1925.)

1. **Evidence** ⬅194—**Production of rope was unnecessary, where there was no dispute as to defect and its being proximate cause of break.**

Where there was no dispute as to existence of defect in tow rope, and its being proximate cause of break, production of rope by libelant was unnecessary.

2. **Towage** ⬅11(11)—**Tug using barge's hawser as towline held not required to carefully separate strands to discover rotten spot.**

Tug using barge's necessarily dirty and discolored hawser as towline *held* not required to examine each foot thereof, by careful separation of strands, to discover "burnt" or rotten spot at which it broke.

3. **Towage** ⬅15(2).

Burden of proof was on libelant, agreeing to tug's use of rotten tow rope, which was proximate cause of injury to libelant's barge.

4. **Towage** ⬅11(1).

Tug, towing barge, is not an insurer, but is liable only for negligence.

5. **Towage** ⬅11(11).

Captain of tug *held* not negligent in borrowing tow rope with rotten spot in it from barge towed.

6. **Towage** ⬅11(11)—**Tug held not at fault where barge's tow rope broke at rotten spot, which was inherent latent defect.**

Tug *held* not at fault, even, if captain were negligent in accepting barge's tow rope, which broke at rotten spot therein, causing barge to drift onto rocks; that being inherent latent defect, discoverable only by taking rope to pieces and subjecting it to expert examination.

In Admiralty. Libel by the Barrett Company against the steam tug Mary J. Kennedy. Libel dismissed.

Decree affirmed, 11 F.(2d) 625.

Macklin, Brown & Van Wyck, of New York City, for libelant.

Foley & Martin, of New York City, for claimant.

INCH, District Judge. This is a libel in rem. There is practically no dispute as to the facts. The decision would seem to rest on a conclusion of law. The question is: Which party must bear the burden of damages, resulting directly from the use of a defective hawser, belonging to a towed barge, but by mutual consent used by the towing tug?

On the 27th day of November, 1923, about 7 o'clock in the morning, the barge Coast Transit No. 1, belonging to libelant, was at the Shadyside Yard, at Shadyside, N. J. She was 140 feet long, 34 feet wide, and had a depth of side of about 11 feet. She was light, and was being used to convey oil, tar, etc., from the Astoria Gas Works, Long Island. She had been used in this work for some time. The customary way followed had been for a tug to take her from Shadyside, down the North River, around the Battery, up to Hell Gate, to Astoria. There she would be loaded with the above material.

It needs no imagination to find that she was not so clean as if engaged in some other business, and that her ropes, lying on her deck or otherwise, however new they were, would soon become covered with dirt and soiled in appearance. On the day in question, the tug Kennedy, belonging to claimant, which also had been engaged in towing such barges many years, appeared to take the No. 1. Its custom had been to take the barges on two separate lines, about 90 feet long, attached to port and starboard bitts of the barge. By arrangement between the parties, the tug always supplied one of these lines, and the master of the barge supplied the other.

The reason, given by the captain of the tug for this customary arrangement, was that, while the hawser of the tug was, of course, long enough, one end was always at the bottom of a huge coil in the hold of the tug, and it would have occasioned a great deal of delay and labor to get at it. By the above method the required length of tow lines was much more easily and quickly obtained. At any rate, this was what happened on said November 27th. The master

of the tug made fast his line, and the master of the barge handed over to the tug, in accordance with the above custom, a 5-inch hawser. This hawser was comparatively new, although soiled, a fact which would cause no reasonable comment.

The lines having been made fast, the tug started down the North River with her tow. Everything went all right until Hell Gate was reached. About off Negro Point, the usual sheer of tows, and occasioned by the tide at that place, occurred. The No. 1, being no exception, took a sheer to port, and the port line broke. It was the line that belonged to the barge.

The barge then took a sheer to the starboard, and, there now being but one line, this also broke. The barge then drifted onto the rocks. The subsequent examination of libelants' line showed, apparently without contradiction, that, at the place it had broken, it was rotten or had been "burnt" through; that is, the discoloration always on the surface of such ropes seems, in this instance, to have gone all the way through.

[1] While neither side produced any portion of the rope, and apparently libelant had its portion, and possibly the remainder, yet it seems to me that, as it was simply a defective spot in the rope, and there was no dispute, on the trial, as to the existence of this spot, and its being the proximate cause of the break, the rule as to the presentation of the rope would be of no application.

[2] The master of the tug says that, before he started, the captain of the barge had passed over this line; that he had looked at it, and it seemed all right; that when he started he went aft, and saw that the barge was made fast properly; that after the accident, when he looked at the breaking point of the rope, it looked as if it had been "burnt" right through; that he could not have taken the barge alongside at Hell Gate, as such would be dangerous navigation; that towing by hawser, at such a place, was the only safe way; that there is no way to prevent a sheer at that place.

Thus it would appear that the accident was caused solely by the use by the tug of a defective rope loaned by libelant. The defect was a "burnt" or rotten spot, in a 5 or 5½ inch comparatively new hawser. The work for which it was being used necessarily made the exterior dirty and discolored. The defect in my opinion was latent.

Unless a burden is to be put on the user tug to examine each foot of hawser so used, not merely with the eye, but by careful separation of the strands, the defect apparently could not have been discovered. No such burden, so far as I can see, has ever been placed on the user tug, in a case where the circumstances are similar to those here.

[3] This brings us to the remaining question. The use by claimant of a rotten or "burnt" rope having been the proximate cause of the injury, should libelant recover, where libelant agreed it should be used? The burden of proof was on libelant. It may well be that, having shown the proximate cause of the accident to be the use of a rotten or "burnt" rope by claimant, a prima facie case was made, at least such as would call for an explanation. This explanation has been given as above set forth.

It is thus apparent that libelant had equal, and even more, time and opportunity to examine its own ropes than claimant. It was equally interested in avoiding the damage, which would reasonably be expected to happen should that rope break. It is plain that both parties believed, and were justified in believing, that this rope was in good condition. There was no apparent defect, the existence of which would have made careless the act of claimant in using it.

[4, 5] The claimant is not an insurer. It is liable only for negligence. What act by claimant, therefore, took place, or omission to act occurred, from which would appear a neglect of claimant's duty to use reasonable care and prudence in towing libelant's barge?

I can see none, unless it be that the courts have decided that the mere act of borrowing a rope under such conditions is carelessness; in other words, that when a captain borrows the rope he borrows all the troubles that go with any latent defect in it. This would seem, in substance, to make him an insurer against a borrowed rope, where he would only be liable for negligence in the case of the use of his own rope.

I am not discussing the degree of care required where the captain borrows a rope of a third person. But where it is libelant's own new rope, apparently loaned as a result of a continuous custom between the parties, I fail to see any negligent act on the part of the captain of the tug in simply borrowing it. I have been presented with no cases to sustain such contention.

[6] Moreover, it should be borne in mind that this is a libel in rem, against the tug Kennedy. I fail to see where the Kennedy, on the facts here, would commit a maritime tort, assuming that her captain could be held to have been negligent in merely accepting li-

belant's rope. The W. G. Mason, 142 F. 913, 74 C. C. A. 83; The Anthracite, 168 F. 693, 94 C. C. A. 179; The Edward G. Murray (C. C. A.) 278 F. 895.

The above does not mean, of course, that a captain is absolved from using due care under all circumstances and he may be required, in the exercise of due care, to examine even more carefully a rope borrowed even from a party such as libelant, than he would where he had bought it. However, in this case, I find no dispute as to the facts relating to his examination or the condition of the rope, and I am loath under the particular facts of this case to place the burden of an adverse decree upon claimant, where I feel on the entire case that the probabilities are that this unfortunate accident was unavoidable, and am satisfied that neither party was in any way negligent.

I think, rather, the situation is as stated by Circuit Judge Lurton, in The Olympia, 61 F. 120, where at page 127 (9 C. C. A. 393, 400) he says: "If due to an inherent and latent defect in the rope (as we think more probable), then the defendants were not in fault, for it was such a defect as was only discoverable by taking the rope to pieces, and subjecting it to expert examination. If defendants have shown, with respect to each possible cause, that the effect could not have been avoided by the use of care, caution, and skill, then the effect was in law unavoidable."

Accordingly I am compelled to dismiss the libel.