THE J. G. NO. 48.

THE HENRY HENJES.

F. E. GRAUWILLER TRANSP. CO., Inc., v. GALLAGHER BROS. SAND & GRAVEL CORPORATION et al.

No. 16932.

District Court, E. D. New York.

Feb. 7, 1945.

774

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant and Gallagher Brothers Sand & Gravel Corporation

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for respondents-impleaded.

Purdy & Lamb, of New York City (Edmund F. Lamb and Thomas J. Irving, both of New York City, of counsel), for claimants-impleaded.

GALSTON, District Judge.

The libellant is the owner of the J. G. No. 48, a deck scow, which was chartered by Gallagher Brothers Sand & Gravel Corporation, under the usual harbor charter. The scow was tight, staunch and in all respects seaworthy at the time of the delivery to the respondents, but was damaged when returned. The respondents impleaded the North Shore Sand & Gravel Corporation, the Elmhurst Contracting Company and the tug Henry Henjes.

The North Shore Sand & Gravel Company undertook to purchase cargoes of sand and gravel for delivery to the Elmhurst Contracting Company at Leonardo, New Jersey, which contracting company was engaged in the construction of a pier extending into Sandy Hook Bay at Leonardo, New Jersey.

The J. G. No. 48, loaded with 356 yards of gravel and 236 yards of sand, arrived at the pier of the Central Railroad of New Jersey at Atlantic Highlands, near Leonardo, on October 23, 1943. After a short period she was towed by the tug Henry Henjes to the east side of a pier which the Construction Company was building at Leonardo, and was moored some distance out shore. The tug was engaged in the towing operation pursuant to a contract made by the Elmhurst Company with the Moran Towing Corporation.

The evidence discloses that at the time that the Elmhurst Construction Company began work in August, 1943, beginning at a point about 1500 feet from shore, a number of concrete blocks were embedded in the bottom under water, about 300 feet off and parallel with the east side of the pier, and about 500 feet apart. The blocks were five by five by three feet in height. One or two feet were embedded. The blocks were to serve when needed as anchors for a floating construction plant which would be moored along the different sections of the dock under construction. Two wire cables were attached to each block. One cable was to receive the end of the mooring lines extending from the equipment to be moored. The end of the second was for the purpose of enabling a buoy to be attached thereto. These buoys were large timbers, crossed and floated on the surface of the water.

The J. G. No. 48 was to have been brought alongside a concrete-mixing plant which was moored to the pier. From each outboard corner of this mixing plant a mooring line extended at an angle of about 45 degrees to a mooring block.

On October 24, 1943, the morning after the J. G. No. 48 had been towed to the east side of the pier, the Henjes took the scow in tow, stern first, making her fast to the tug's starboard side. The tow proceeded from the dock a distance of about 300 feet, then swung to starboard on a course substantially parallel with the east side of the pier. Sarin, the scowman, described the maneuver, using models for his purpose, from which description and demonstration it appeared that the port stern corner of the scow went over the end of the line, and the scow raised so that her port stern side was about three feet high and her starboard side low. Sarin added: "At that time she went down and struck a bank or something like that. That is the time she listed." Water came in at once and the scow sank within a short time thereafter.

It is the contention of the libellant that the J. G. No. 48 struck a mooring block because of the negligent operation

by the tug. That the J. G. No. 48 sank as the result of striking one of the mooring blocks was admitted by the Elmhurst Company in its answer to the fourteenth allegation of the Gallagher intervening petition, and is repeated by that company in answer to the eleventh interrogatory propounded by the libellant. Moreover, one of the officials of the Elmhurst Company made the same admission in a talk with an officer of Gallagher Brothers shortly following the sinking of the scow.

On the other hand, it is claimed by the Henjes that the evidence does not support the contention that the scow struck a concrete block and that it was stranded as a consequence thereof.

However, I find the evidence does support the libellant; and there was none offered to show that the sinking was caused in any other way.

Immediately after the J. G. No. 48 sank, a survey party sought to identify the location. Hollahan, an assistant chief engineer of the Elmhurst Company, testified that the No. 48 had been on one of the concrete blocks. He had himself seen the scow at 9:30 a. m. and she was then lying off the concrete plant at the east side of it, about 300 feet from the pier. Essentially corroborative testimony was given by Wik, a disinterested witness who was working for the Seaboard Sand & Gravel Corporation, and who was in the vicinity at the time. Wik estimated the distance of the side of the scow on the morning of October 25th about 75 feet from where the mooring line entered the water. Sarin, the scowman, had estimated that the bow of his boat was about 35 or 40 feet from where the line went into the water. Then too, from all the testimony offered it is a reasonable inference that before the scow settled on the bottom, the No. 48 was on a course in which she would have encountered a mooring block.

The damage involved the stern mud log and adjoining bottom planks. Such damage could readily have resulted from striking a concrete block.

■ It is the contention of the Henjes that even if the scow had stranded on the mooring block, the fault is that of the Elmhurst Company in failing properly to mark or buoy the mooring block. The evidence though is against this contention. There is positive testimony that a short time after the accident the buoy on the off shore line in question was seen by various witnesses, including the master of the Henjes. The testimony of the master that before the accident he did not see a buoy or marker on the outshore line is not convincing, for the load on the scow would normally obstruct his vision. He admitted that though he could see over the top of the load, he could not see for a distance up to 300 feet from the port side of the scow. Although the scow was being towed stern first, there was no deckhand on the stern. The length of the scow was 112 feet, so that a man stationed on the bow of the scow would have been 412 feet away from the buoy before he could have seen it. Since the buoys were only horizontal timbers floating on the surface of the water, it is doubtful if either one of these men could have observed the buoy at the distance indicated.

■ Again, the Henjes had operated in that area for some time in shifting vessels, and must be charged with knowledge of the general location of the mooring blocks and the buoys which served to mark them. It must be concluded that the Henjes did not exercise due care. The W. G. Mason, 2 Cir., 142 F. 913; The Nat E. Sutton, 2 Cir., 62 F.2d 787; The Reichert Line, 2 Cir., 64 F.2d 13; The McLain No. 3, D.C., 13 F.Supp. 402.

■ The record discloses that the unloading of the scow was commenced on the same morning on which she stranded, and continued until 4 o'clock that afternoon, at which time the rising tide covered the deck and the cargo. By the following day the wind had increased and the weather conditions were such as to prevent the discharge of the cargo in safety. Added to this difficulty is the fact that the Elmhurst Company during the morning found it necessary that all of its activities be devoted to guarding the safety of other equipment at the plant because of storm warnings which had been received. The libellant had, on the morning of October 25th, been informed that the Elmhurst Company would undertake the unloading of the scow, and the respondent Gallagher Brothers received similar advices. It seems, in all the circumstances, that the libellant, as well as Gallagher Brothers, was justified in relying on the Elmhurst Company, for otherwise it would have been necessary for them or either of them to engage apparatus in New York Harbor and have it towed to Leonardo. Such towage would have required from four to six hours, assuming

that equipment could have been obtained. I think, therefore, that the damage which resulted from the storm must be chargeable to the stranding, as the libellant contends.

The libellant may have a decree which will set forth the primary liability of the Henjes, with secondary liability chargeable to Elmhurst, and thirdly to the respondent Gallagher Brothers.

Concurrently herewith, findings of fact and conclusions of law, in conformity with the foregoing, will be filed.