VALENTINE H. NEWMAN v. WILLIAM M. LOCKE AND
WILLIAM C. STEVENS.

*Mortgage—Equity of redemption—Extension to mortgagor—Fraud.*

This case being decided on questions of fact, reference is had to the
opinions for greater certainty.

Appeal from Iosco. (Tuttle, J.) Argued February 1,
1887. Decided May 5, 1887.

Bill to redeem from a mortgage. Complainant appeals
from decree dismissing bill. Decree reversed, and reference
and accounting ordered. The facts are stated in the dissent-
ing opinion.

*Robert Hovenden* (*Hanchett & Stark* and *O. E. M.
Cutcheon,* of counsel), for complainant.

*Wheeler & McKnight,* for defendants.

CAMPBELL, C. J. The only question in this case is whether
Locke took the title to the Newman property from the fore-
closure holder, to be held absolutely, or to allow complainant
further time for redemption. There may, perhaps, have
been some misunderstanding about the matter, but I am sat-
isfied that complainant understood, and had every reason to
understand, that the title was taken for his benefit. The
equity of redemption was of considerable value, and a relin-
quishment of it would have been too great a sacrifice to make,
unless it was absolutely hopeless to save it. Considering all
the testimony, it has convinced me that complainant, from
the acts and conversation of defendants, was led to giving up
efforts to get money in other quarters, and to rest on the
assurance that his interests were secure from further peril.

It is not necessary to suppose any one has intentionally represented facts incorrectly. But in considering mutual dealings we must look at all that was done, as well as all that was said; and I am unable to reach any other conclusion than that complainant had a right to rely on what took place, and did rely on it.

If this is so, there should be a reversal of the decree below, and the usual decree for reference and accounting and redemption for the balance found due, or sale to collect it, in the ordinary course of practice in such cases, and a remand to the circuit for these purposes.

SHERWOOD and MORSE, JJ., concurred.

CHAMPLIN, J. (*dissenting*). The bill in this case is filed to redeem certain premises from a mortgage which was executed by one Eliza Newman to Alexander Nelson.

The claim of the complainant is that a mortgage given by Eliza Newman to Nelson having become due, and being unpaid, Nelson commenced a foreclosure thereof by advertisement in February, 1879. The premises were sold on the twentieth of May following, and were bid off by Nelson. No question is made as to the regularity of the proceedings to foreclose. After the sale, Nelson conveyed his interest to one Benjamin Richards by quitclaim deed.

Mrs. Stevens, the wife of defendant Stevens, had a claim against Nelson and others for over $2,000, and Stevens proposed to loan said money, when recovered from Nelson, to Eliza Newman for five years at 7 per cent., with which to pay off the Nelson mortgage, if she would take an assignment of said claim from Mrs. Stevens, and prosecute it against Nelson for the benefit of Mrs Stevens. Mrs. Newman assented, and in pursuance thereof the claim was assigned to her, and she commenced a prosecution thereof, and the same was pending at her death, which occurred in December, 1879, and was thereafter prosecuted by the complainant, who was her administrator and sole heir, until

September 20, 1881, when Nelson paid the claim to defendant Stevens, who acted as plaintiff's attorney, and, upon said money being collected, he retained it for Mrs. Stevens, in pursuance of said agreement. The claim of complainant, as stated in the bill, proceeds as follows:

" Your orator further represents that the long time said suit was pending was occasioned by several adjournments, which delay was unlooked for, and a great loss and damage to your orator, as the year of redemption was fast passing away.

" Your orator further represents that at last, failing to get the benefit of the use of said $2,000, or such part of it as was necessary, in time to redeem from said mortgage by means of such collection, his father, Orlando Newman, as such agent, sought to borrow the money, and made arrangements to obtain the money therefor with a party residing at Pontiac; when the defendants, on being so informed, stated to him that they would help him to make redemption from said mortgage sale, and would furnish the money therefor, and represented that they were anxious not to be disturbed as tenants, and proposed to loan a sufficient sum of money to take up and redeem the Nelson mortgage, at 7 per cent. per annum, until the money, which was expected from week to week, would come from the Nelson claim, assigned to Eliza Newman, aforesaid; which offer was accepted by said Orlando Newman, who left all the legal business connected therewith, and the proper arrangements to be made to carry out such loan, the making the security therefor, and such redemption, in the hands and control of his attorney, William C. Stevens aforesaid.

"Your orator further represents that it was mutually agreed between said Orlando Newman, Locke, and Stevens that said Locke should pay $1,750 to said Richards to redeem said property from said mortgage for your orator,—that being the amount required to make such redemption,—five days before the year of redemption ran out and expired, to wit, on the fifteenth day of May, A. D. 1880, and, upon such payment to said Richards, said Locke took a quitclaim deed from said Richards of said real estate, to be held by said Locke as a security for the money so furnished by him; that the taking of such quitclaim deed as such security was by the advice of said Stevens as attorney for said Orlando Newman and your orator.

"Your orator further represents that said William C. Stevens drew up said deed, and was witness and notary therein; which deed (heretofore referred to, and to which the attention of this court was respectfully and particularly requested) was made and executed by said Richards and his wife on the fifteenth day of May, A. D. 1880, and recorded on the sixth day of July, A. D. 1880, in Liber 14 of Deeds, on page 101, in said register's office, to which reference is prayed.

"Your orator further shows that said Orlando Newman omitted to loan the money to make said redemption from the man in Pontiac, because said Locke and Stevens desired him to do so, and that he should obtain the money therefor from said Locke; and he relied entirely upon their requests and representations that said Locke would make such redemption, and that the same would be properly done.

"Your orator further represents that he and his father understood and believed that the property involved was saved and redeemed for your orator in the manner above stated. He further shows that said Locke and Stevens remained occupying the said premises as they had done before; and your orator understood and believed that the rents coming due and accumulating from said defendants would be applied upon the loan so made by said Locke; and nothing occurred to disturb him in relation to said business, except the delay in recovering the money due from Nelson, of which he expected to have the loan as stated and set forth above.

"Your orator further represents that at length, on the twentieth day of September, A. D. 1881, Nelson, aforesaid, paid the money to said William C. Stevens; and on the next day, the twenty-first day of September, A. D. 1881, said Stevens informed Orlando Newman, aforesaid, that he was now ready to loan said money, as he had covenanted and promised to do, as above stated.

"Your orator further says that his father then applied to said Locke for an adjustment of the business relating to the money furnished by him for such redemption, to which said Locke was unwilling to assent, and, after repeated efforts, said Orlando Newman succeeded in getting Locke to go to William C. Stevens' law office, when he (said Orlando Newman) then and there offered to pay him (said Locke) what was due him according to their said agreement for the moneys furnished by said Locke.

"Your orator further says that said William M. Locke refused to come to any adjustment, and declared that the

property was his,—that he had a deed for it, and that he should hold on to it; which claim is a gross fraud upon your orator."

The complainant then proceeds to state why he delayed to bring suit, and says—

"That lately, and within a few weeks last past, he has taken legal counsel, and been informed that he could have been protected at any time in respect to his said mortgaged property if he would apply to your honorable court, as his attorney, William C. Stevens, ought to have done immediately after the refusal of Locke to redeem and account."

He then charges that he ascertained, in January, 1885, that Stevens was jointly interested in said purchase of said Locke; that he has tried in vain to get a settlement with defendants; and that they refused to recognize his rights in the premises.

The defendants in their answer positively deny that they promised to help him make redemption from said mortgage sale, or to furnish him the money therefor. They deny that they proposed to loan him a sufficient sum of money to redeem the Nelson mortgage at 7 per cent. per annum until the money, which was expected from week to week, would come from the Nelson claim. They also deny the other material allegations quoted above from complainant's bill, except the drafting of the deed from Richards to Locke, and the execution and record thereof.

The evidence by which the complainant seeks to establish his case is mainly the testimony of Orlando Newman, the father of complainant, and who, it is claimed, was acting as the agent of his wife and of complainant in the transactions covered by the bill of complaint. He testified that he intended to redeem from the foreclosure sale, and with that view negotiated for a loan of Mr Lounsbury, of Pontiac, who, at his request, came to East Tawas, and on the fifteenth of May, 1880, was with him in Mr. Stevens' back office; that

Stevens was in the front room. I quote from his testimony:

"*Q.* Now, then, what occurred there?

"*A.* Mr. Locke came to the door, and said he wished to speak to me.

"*Q.* What did you do?

"*A.* I went out into Mr. Stevens' room. I asked Mr. Lounsbury to excuse me a moment. Mr. Locke said that him and Mr. Stevens had been talking my matter over. He asked me first if I was going to get money of Lounsbury to redeem the store, and I told him that I could get it, but I had to pay pretty well for it. He said then, ' We have been talking this matter over, and we will make you a better proposition,—I will make you a better proposition;' and I says, ' What is it?' ' Well,' he says, ' I will lend you the money for 7 per cent. till this Nelson matter is settled, and then we will settle, and you pay it back, and we will pay you the same rents that we have been.' He says, ' It will be better for you and better for us, and it will help reduce the cost, and it will save you the $100 bonus and 10 per cent.' That is what Mr. Lounsbury asked me. I says, ' I must be sure of this, because Mr. Lounsbury is here with the money, and if he goes away I cannot get him back again. Are you sure you can let me have the money?' Locke says, ' Yes, sir;' and Stevens says, ' If he has not got enough, Mrs. Stevens has $600 or $700, and it is not drawing any interest; I will borrow it and lend it to him.' Locke says, 'Go and tell Lounsbury you don't want his money.' I went back into the room, and told Mr. Lounsbury that I could get the money of Mr. Locke, and at better rates; and, if it would not discommode him, I would rather not take his money. He said I could have written him this just as well,—he was a little offended about it,—and save his expenses up. I told him I would pay his expenses up and back, and I did so. Mr. Lounsbury went away.

"*Q.* That same day?

"*A.* Yes, sir. That was about 11 o'clock then, and he wanted to go and get his dinner and go on the boat.

"*Q.* And he did go?

"*A.* Yes, sir. After he went out, I said, 'Now, Mr. Stevens, you had better go up and see Mr. Richards about this matter.' Richards then held the Nelson mortgage.

"*Q.* That is, after the sheriff's sale, the matter had been sold to Mr. Richards by Mr. Nelson?

"*A.* Yes, sir; and when I came back Mr. Richards owned it.

"*Q.* Now, you told Stevens?

"*A.* Stevens said, 'No; let Locke go.' I told him that Richards was not a very good friend of mine, and he said, 'No, let Locke go; Richards won't speak to me.' Locke says, 'I ain't afraid to go up and talk with him; he is a brother Methodist;' and started out. In a little while Locke came back and said, 'I have made a bargain with the old deacon.' I asked him what it was. He said he was to give him $1,750; he was to pay him $1,000 down, and a note for $750 due in a year, but he had got to give an indorsed note. He said Richards would not take neither me nor Stevens; he had got to get George Smith. He started out to see George Smith to see if he would indorse the note.

"*Q.* Did you see him again?

"*A.* I did not see him again that forenoon. It was noon by this time.

"*Q.* When did you see him?

"*A.* I think, in the afternoon.

"*Q.* Well, what did he say?

"*A.* Mr. Locke did not say any more about it; that is, he said he got it closed up; and Mr. Smith told me he indorsed the note.

"*Q.* What did Mr. Stevens say about having closed the matter up, if anything?

"*A.* I says: 'Mr. Stevens—.' When Locke came from Smiths' office he did not come into Stevens' office, but went right straight to Richards'. We saw him going by, and we concluded he had got the indorsement. I says, 'Now, I suppose we will have to make some writings between me and Locke.' Stevens said he did not know whether that was necessary or not; 'I am knowing to the whole transaction, and it will be but a short time before the Nelson trial comes on, and if he wants anything I will fix it up.' I told him to fix up anything that Locke wanted for security."

If this testimony is true, the complainant is entitled to relief; for the neglect or refusal to carry out the agreement would operate as a fraud upon complainant. *Laing v. McKee,* 13 Mich. 124; *Wilson v. Eggleston,* 27 Id. 260.

The witness is corroborated by Mr. Lounsbury upon the point that he requested the loan for the purpose of redeeming, and his willingness to make it, and Newman's refusal to

complete the·loan for the reason that he had received a better offer. Both Locke and Stevens deny that any such conversation or arrangement or offer was made as stated by Newman; and the question is, upon this vital point, has complainant established it by a preponderance of evidence? To determine this, all the facts and circumstances must be considered which lend probability to the one side or the other.

It is claimed that in the month of June, 1880, being the next month after the deed to Locke, Mr. Newman procured Lyman G. Fuller to come from the state of New York with a view of making a trade of his farm in New York for the property of Newman at East Tawas. But it appears from Fuller's testimony that the trade was talked of between himself and Newman during the preceding winter, and that he came out to see the property after navigation opened. He looked the property over, and talked with Locke, who was and had been occupying a store, being part of the property involved in this suit, and told him he talked of trading for the property, and asked him if he would enter into a lease for a term of years; and Locke replied that he would lease it only for a year.

This testimony would have a bearing upon the question if it were not for the fact that Locke testifies that he told Fuller that they had bought the property, and had put their money into it; but that, if Mr. Newman could make anything out of it by effecting a trade, all they asked him to do would be to reimburse them for their money paid out, and that he might go on with his trade. Here, again, is a flat contradiction between Mr. Fuller and Mr. Locke, and neither is corroborated by other testimony. It also appears from Lounsbury's testimony that he did not come to East Tawas on the occasion referred to by Newman to make a loan of money to him, but to receive money covered by a mortgage given by Newman, which land had been sold to one Joslyn, who paid the money to Lounsbury.

It appears that complainant and his father continued in possession of a dwelling-house upon the premises until sometime in the summer of 1881, when Mr. Wilmot, a clerk in the employ of Mr. Locke, went into possession. Mr. Newman testifies that Locke applied to him to rent the house for Mr. Wilmot to live in, and that he agreed to rent it to Locke for $10 a month, including barn and garden, reserving one room in which to store his furniture. On the contrary, Mr. Locke testifies that he told Mr. Newman he wanted possession of the house for Mr. Wilmot, and Mr. Newman made no objections, merely requesting the privilege of storing some furniture in one room; that he asked Wilmot if he could get along without that room, and he said he could, and he thereupon gave Newman the privilege of storing his goods in one room; that he never rented the house of him, or agreed to pay him any rent therefor, and there was no conversation about renting it.

The property was paying a rental of $350 to $400 at the time Richards deeded to Locke, which, at the rate of interest money was letting for at East Tawas, would indicate that the property was worth between $3,000 and $4,000. Complainant introduced witnesses who placed its value at from $4,500 to $6,000. Orlando Newman valued it at $7,000, and says he had refused $6,000. The defendants valued it at about $1,800, and say in their judgment it was all it was worth. They introduced witnesses who gave their opinion that it was not worth over $2,000 to $2,500.

Evidence was introduced tending to show that real estate at that time was depressed; that the town depended upon the manufacture of lumber, and that many, if not all, of the lumbering firms had failed; that when the timber was cut off there would be nothing left to support a village, and the prospect was gloomy. Since that time a railroad leading into the pineries has been built and operated, which has had a tendency to raise the value of real estate some.

Defendants testify that Mr. Newman told them that he would be unable to redeem the property from the foreclosure sale, and urged them to buy it of Richards, as he would rather they would have any benefit to be derived from it than to have it fall into the hands of Nelson or Richards.

Attention is called to the fact that money readily commanded at least 10 per cent. interest, and the mortgage in question drew that rate; and it is urged as quite unlikely the defendants would have agreed to advance the money to redeem the mortgage at the rate of 7 per cent. for five years. Moreover, it is claimed and testified to by defendants that Newman never claimed any interest in the property until just previous to the time of filing the bill. He did apply to defendants with a proposition to get the property back; and Stevens was willing to convey his interest upon being reimbursed what he had paid out, and interest, but Locke refused.

It is needless to pursue the subject further. It is impossible to reconcile the testimony in the case, and it is alike impossible to say that the weight of the testimony preponderates in favor of the complainant. Entertaining these views regarding the weight of the evidence, I cannot concur with my brethren in reversing the decree of the court below.