THOMPSON TOWING & WRECKING ASS'N et al. v. McGREGOR et al.

(Circuit Court of Appeals, Sixth Circuit.   August 4, 1913.)

No. 2,262.

**1.** SEAMEN (§ 29*)—INJURY IN SERVICE—LIABILITY OF VESSEL.

The duty of a shipowner to see that she is seaworthy and equipped with proper appliances when starting on a voyage or other assigned work is a positive one which cannot be delegated, and he is liable for any injury to a seaman arising from his failure to perform it.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 186, 188–194; Dec. Dig. § 29.*]

**2.** SHIPPING (§ 209*)—LIMITATION OF LIABILITY—PROCEEDINGS—SURRENDER OF VESSELS.

Where a lighter without motive power was being used by a tug, the property of the same owner, to aid in floating a stranded steamer by receiving a part of the cargo, when a defective pump boiler on the lighter exploded, injuring members of her crew, the two vessels are to be regarded as having been a single instrumentality, and both were properly required to be surrendered by the owner in proceedings for limitation of liability.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 646–655, 659, 661, 662; Dec. Dig. § 209.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

**3.** SHIPPING (§ 209*)—PROCEEDINGS FOR LIMITATION OF LIABILITY—BURDEN OF PROOF.

Under admiralty rule 54, which requires claimants, upon issuance of a monition in proceedings for limitation of liability, to appear and "make due proof of their respective claims," the burden rests on a claimant of damages for a death to prove the time and place of such death where those facts are material.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 646–655, 659, 661, 662; Dec. Dig. § 209.*]

**4.** DEATH (§ 8*)—ACTION FOR WRONGFUL DEATH—JURISDICTION—VESSEL ON GREAT LAKES.

Claimant's intestate was killed by the explosion of a boiler on a lighter temporarily engaged in assisting to release a steamer stranded in Mud Lake, an extension of Lake Huron through which passes the boundary line between Michigan and Ontario; the lighter being at the time near the line but probably on the Canadian side. The vessel was owned and registered in Michigan. *Held* that, while in such waters, she constructively constituted a part of the territory of Michigan, and that, in the absence of any legislation by Congress on the subject, the Michigan statute giving a right of action for wrongful death was applicable.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 12, 36, 52, 121, 133; Dec. Dig. § 8.*]

**5.** COURTS (§ 366*)—FEDERAL COURTS—FOLLOWING STATE LAW—INTEREST AS DAMAGES.

Where damages for wrongful death are recovered in a court of admiralty under a state statute, the rule as to the allowance of interest, established under the statute by the court of last resort of the state, will be followed.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*

State laws as rule of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71;  Hill v. Hite, 29 C. C. A. 553.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
207 F.—14

Appeal from the District Court of the United States for the Western District of Michigan; Arthur C. Denison, Judge.

Proceeding in admiralty by the Thompson Towing & Wrecking Association and the Great Lakes Towing Company for limitation of liability. Appeal by petitioners from decrees in favor of William McGregor and Matilda Workman, administratrix. Affirmed.

This is an appeal from a decree entered in a proceeding to limit liability respecting a boiler explosion on the lighter Stewart, which resulted in the instant death of Workman on board the vessel and in permanent injury to McGregor, who were members of her crew; such proceeding having been commenced pursuant to sections 4283 et seq., and amendments, of the Revised Statutes of the United States (U. S. Comp. St. 1901, pp. 2943 et seq.). The explosion occurred in Mud Lake, an arm or bay of Lake Huron, near the mouth of St. Mary's river. Ainsworth v. Munoskong Hunting & Fishing Club, 159 Mich. 61, 123 N. W. 802. The ore-carrying steamer Elwood had grounded there, and the lighter Stewart with other vessels of appellants had been engaged to float the Elwood. The immediate occasion of appellants' proceeding was the commencement by appellees of separate suits in a county court of Michigan to recover damages for the death and permanent injuries mentioned. Under the usual averments of a petition both to limit and to contest liability, surrender and appraisal alone of the Stewart were sought and made and stipulation covering such appraisal was substituted for the lighter; monition and publication addressed specially to appellees and also to all other persons claiming damages or liens on account of injuries caused by the explosion were issued and made, citing appellees and such other persons to appear in the court below and make proof of their respective claims; and an order was made restraining all from prosecuting suits arising out of the explosion, except as against such stipulation. Subsequently default was taken against all persons claiming injuries from the explosion, except only the appellees; and thus the controversy was reduced to the parties to this appeal.

Appellees filed answers to the petition; and, upon complaint that the original surrender and stipulation should have included further vessels and certain pending freight, additional stipulations were required and filed embracing the value of the steam tug Merrick, which belonged to appellants and was engaged with the Stewart in lightering and floating the Elwood, and also distinct pending freight. September 6, 1911, final decree was entered in favor of each of the appellees, which resulted in this appeal. Further necessary facts appear, with objections passed upon, in the opinion.

Keena, Lightner, Oxtoby & Oxtoby, of Detroit, Mich. (Hermon A. Kelley, of Cleveland, Ohio, of counsel), for appellants.

John W. Shine and E. S. B. Sutton, both of Sault Ste. Marie, Mich., for appellees.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

WARRINGTON, Circuit Judge (after stating the facts as above). The claims of both appellees have been presented and considered together.

[1] 1. It is objected that the appellants are not shown to have been guilty of negligence, which was the proximate cause of the explosion. The effort is to show that all who were at the time engaged on the Stewart, including the captain, were members of the crew, and so to excuse the owners under the fellow-servant doctrine. This fails to give due effect to the condition of both the boiler and the hull of the Stewart. The boiler was formerly in use on the Crusader. In 1896 the Crusader burned to the water's edge and the remnants of its hull,

including the boiler, sank. Some four years later the boiler was raised and placed in the Stewart. Besides the proved impairment of the boiler by reason of the fire and the time it was under water, it was suffered to fall into serious disrepair while on the Stewart. The year before the explosion, the safety valve of the boiler had been taken off and the opening plugged. The steam gauge was so broken and otherwise out of order that the steam pressure could not be ascertained, even approximately, except by tapping and manipulating the gauge; and the water gauge would not disclose the stage of water in the boiler. Thus the appliances for avoiding excessive pressures of steam or stages of water below the normal were grossly defective; and, as to substituting "plugging" for a safety valve, we agree with Judge Denison, who in deciding the case below said:

"The absence of the safety valve might well be presumed the cause of the explosion and, for the purposes of this case, I think that fact should be considered as established."

These matters were common knowledge among those who had to do with the boiler. Moreover, the boat itself was old; it had been a schooner and converted into a lighter; it carried two boilers, one for operating its derrick and the other (the one that exploded) for pumping water. The Stewart had not been "fitted out" in the year of the explosion; it leaked badly when heavily loaded, as it appears to have been at the time; indeed, the boiler that exploded was then in use to pump out her hull.

These details are sufficient, without more, to warrant turning to the inquiry whether the owners of the Stewart were chargeable with knowledge of such conditions as these. Capt. Thompson was the local manager of the owners in Sault Ste. Marie, Mich., and, although his "orders came from officials at Cleveland," he testified that he had "general charge of the sending of the expedition to the Elwood," and further that he ordered "the outfit down there to do the work that was required to get that vessel afloat." There was evidence tending to show that he had knowledge of these conditions. True, he disclaimed such knowledge, but their proved existence made denial vain; they had been allowed to remain too long, almost a year; and we think it is not too much to say that the owners were chargeable with knowledge of them and of the danger their existence meant to the crew when the vessel was hired and started on its mission to lighter the Elwood.

It is the duty of a shipowner, for the purposes either of a voyage or of an undertaking like this, to furnish a vessel, with the usual and necessary appliances, in such condition and repair as reasonably to attain the objects intended; in a word, the vessel as an entirety must be seaworthy; and the owner's duty in this behalf is positive and non-assignable. La Fernier v. Soo River Wrecking Co., 129 Mich. 596, 89 N. W. 353; The Drumelton (D. C.) 158 Fed. 455, 456; Hughes on Admiralty, 184, and citations announcing the rule, although the facts of the particular cases did not warrant its application. See, also, Cornell Steamboat Co. v. Fallon, 179 Fed. 293, 294, 295, 102 C. C. A. 345 (C. C. A. 2d Cir.); The Lowlands (D. C.) 142 Fed. 888; Lafourche

Packet Co. v. Henderson, 94 Fed. 872, 873, 36 C. C. A. 519 (C. C. A. 5th Cir.). In short, we must regard the applicable rule of liability as settled by The Osceola, 189 U. S. 158, pages 173, 174, 23 Sup. Ct. 483, 47 L. Ed. 760, where Mr. Justice Brown in the course of the opinion pointed out the distinction between the duty of the shipowner as to seaworthiness and fitness of appliances and his duty concerning matters of navigation and the like, and then, in summing up in four propositions, said in the second (189 U. S. 175, 23 Sup. Ct. 487, 47 L. Ed. 760):

"That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship."

This rule does not differ in principle from the rule which holds a master liable in damages for neglect of his positive duty to his injured servant, no matter whether such injury is due in part to neglect of fellow servants or not. Kreigh v. Westinghouse & Co., 214 U. S. 249, 257, 29 Sup. Ct. 619, 53 L. Ed. 984.

[2] 2. Objection was next made to the action of the court below in requiring a stipulation to include the tug Merrick; the insistence being that the appellants' liability is limited to the Stewart. The appraised value of the Stewart was $1,400; and the value of the Merrick, as ultimately reduced, was $10,000. Objection is also made to the valuation placed upon the Merrick; but in view of the evidence, which need not be recited, we are not disposed to interfere with the value fixed below. The argument that the stipulation regarding the Merrick should not have been exacted is that the Merrick was not concerned in the accident. The Stewart was not equipped with motive power and in her movements was wholly dependent upon that of some other vessel. Capt. Thompson sent to the relief of the Elwood the tug Merrick and the lighter Stewart; the former towing the latter to the Elwood. It is true that he sent other boats to engage in the same operation, but the effort to force either the surrender of those boats or the giving of a stipulation covering their value failed. The situation of the Merrick and Stewart before and at the time of the explosion and the conditions in effect converting those boats into a unitary instrumentality while working to release the Elwood were aptly described and, as we conceive, the applicable law forcefully stated by Judge Denison. He said:

"I think, however, that the Merrick and the Stewart, under these circumstances, belong together. The Merrick was the motive power of the combination, without which the lighter could not move. They were, at the moment, physically connected, through the Elwood. The Merrick could not move the Elwood until part of her cargo was taken out, and the most effective way was to keep on removing cargo to the Merrick's attendant barge while the Merrick kept on pulling. Both boats were jointly engaged in floating the Elwood, the Stewart in one way and the Merrick in another; and the work which the Stewart was doing was a necessary element in the work which the Merrick was doing. The fact the Stewart had, for a short time, discontinued removing cargo while the Merrick was pulling cannot be controlling. Whether or not the master of the Elwood had general control, the Stewart was, as between the Merrick and the Stewart, under the direction of the Merrick's captain. The Merrick had placed the Stewart and would soon

take her away, unless the Thompson Company substituted some other tug for that duty.  Under such circumstances, the two boats together constituted the unit that must be surrendered in order to justify a limitation of liability.  The Northern Belle, 9 Wall. 526, 19 L. Ed. 746;  The Arturo (D. C.) 6 Fed. 308, Lowell, C. J.;  The Alabama (C. C.) 22 Fed. 449, Pardee, C. J.;  The Bordentown (D. C.) 40 Fed. 686, Brown, D. J.;  The Columbia, 73 Fed. at page 237, 19 C. C. A. 436 (C. C. A. 9).  Even if the more limited rule of The Mason, 142 Fed. 913, 74 C. C. A. 83 (C. C. A. 2), reversing (D. C.) 131 Fed. 632, was to prevail in this court, still I think that the character of the Stewart's work as incidental to the main service being performed by the Merrick, and the fact that the good condition of this boiler was indirectly necessary in order that the Elwood might yield to the Merrick's pull, distinguish the present case.  See, also, The Anthracite (D. C.) 162 Fed. 384, Adams, D. J."

And on rehearing the court further said:

"There has been exhaustive argument upon the meritorious question whether the tug Merrick should have been included in the surrender, or her value in the stipulation.  I cannot doubt that the question of the liability of the Merrick is a close one, but I find no controlling authority which prevents what seems to me the very proper course of holding her liable in this case.  Unquestionably both the Merrick and the lighter were engaged in a common enterprise;  they were physically connected, although, instead of being lashed rail to rail, the Elwood and a tow line intervened;  the then existing act of the Stewart in lightering the Elwood was an act in aid of and in co-operation with the then existing pull of the Merrick on the tow line;  and the act of the Merrick in so pulling was in co-operation with and in aid of the lightering being conducted by the Stewart.  In addition, I think the fair assumption is that the captain of the Merrick was in practical control of the lighter and the tug.  There is no very clear testimony to this effect, but the natural relations between the captain of a powerful tug, the flagship of the wrecking fleet, and the man in charge (perhaps by courtesy called captain) of what was practically only a scow would be to this effect.  There is no practical doubt that the captain of the lighter would have obeyed any instructions which the captain of the tug had seen fit to give.

"The situation would be different if the negligent act which is to condemn the particular, guilty rem had been the independent act of an agent who had to do with the Stewart only (as in The Mason and similar cases).  Here, however, the damage(d) claimant(s) count upon the negligence of the agent in charge of both boats who equipped and sent out the defective boiler as part of a working unit, and the damage happened at a moment when these possibly separable parts were in fact united."

It is strenuously argued by counsel that to hold the Merrick would be to establish a rule that would be most injurious to the shipping interests of the Great Lakes.  The reason assigned is stated in the margin.[1]  The most obvious answer to this complaint is that, although the appellants furnished at least four vessels to release the Elwood, the

[1] "In relation to vessel owners generally, that doctrine would involve in a common liability the steamer and all the barges in a tow, regardless of the question of the fault of the respective vessels;  in relation to the wrecking business it would involve all tugs, pumps, lighters, diver's outfit, and all wrecking apparatus merely because they happened at some time to have been engaged upon the release of the same vessel, and irrespective not only of their fault but of the extent or character of the service in which they were engaged, or even the terms of their employment;  and in general it would practically nullify the right of the owner to limit his liability to the value of the vessel or vessels actually responsible for an injury and extend that liability to all other vessels and property which such owner happened to have and which chanced to be directly or indirectly connected with the expedition upon which the accident occurred."

effort made in the court below, as we have already said, to hold any of them except the Merrick and the Stewart failed. We should add that the appellees sought also to have the Elwood and her cargo held, but the application was denied. These eliminating processes of the trial court do more than to illustrate the error of the criticism made of the decision. They point out the necessity of studying the facts not only of the case in hand but also of the cases cited and relied on as precedents, for the purpose of identifying in each instance the offending thing, whether that be a single or a composite instrumentality. The particular feature, then, constantly to be borne in mind here is the mutual dependence of the Merrick and the Stewart in the work of releasing the Elwood; as Judge Addison Brown said in The Bordentown, 40 Fed. 687, when speaking of the Bordentown and the Winnie, although engaged in towing, they "were in effect one vessel." Attention to a fact like this cannot be effectively diverted by allusion to the terms of employment of the Merrick and Stewart, because their unitary characteristics existed at the crucial moment of the explosion. We think this fact alone brings this case within the principles of the decisions relied on in the opinion below and distinguishes it from the cases claimed to be opposed to it. The existence of a similar fact in the Bordentown Case was regarded as a distinguishing feature even in the Mason Case, 142 Fed. 916, 74 C. C. A. 83 (C. C. A. 2d Cir.), upon which so much reliance is placed by appellants. Again, we think it is fairly to be inferred from the opinion in the Mason Case that, while the steam tugs, the Mason and the Babcock, were engaged in towing the steamship Gratwick, they were acting in independent capacities and so did not present the fact which is controlling here; and of this Judge Wallace said (142 Fed. 918, 74 C. C. A. 88):

"If the liability of the owner for the tort or wrong of a vessel, arising from the misconduct or negligence of her master or crew, could be enforced against another vessel belonging to the same owner, whenever she might happen to be engaged in the same enterprise with the other vessel, though acting in an independent capacity, and under the control of her own master and crew, in performing her part of it, the spirit and meaning of the statute limiting the liabilities of vessel owners would be disregarded."

There is nothing contained in the report of The Sunbeam, 195 Fed. 469, 115 C. C. A. 370 (C. C. A. 2d Cir.), following the ruling in the Mason Case, to show what, if any, vital relations existed between the work of the offending scow, the Sunbeam, and the other vessels which were not surrendered. We conclude that it is to effectuate, not to defeat, the intent of Congress in its enactment of the laws empowering shipowners to limit their liability respecting marine disasters,[2] to deny to an owner the right to surrender only one of two interdependent vessels, which he had negligently united and furnished, as here, for a joint service in releasing a stranded ship; it is enough in such circumstances to permit him to avail himself of the benefits of the limitation statutes at all.

3. Objection is also made to the claim of Matilda Workman, as administratrix. The grounds are that the explosion occurred in Canadian

[2] Monongahela River Consol. Coal & Coke Co. v. Hurst, 200 Fed. 711, 715 (C. C. A. 6th Cir.), and cases there cited.

waters; that the right of recovery for the death ot her intestate is governed by the laws of the province of Ontario; and that her suit was not commenced within the time prescribed by the statute of that province respecting such actions. The explosion and the death occurred November 25, 1900, and, as we have said, separate suits were brought by the appellants in a county court of Michigan; but Mrs. Workman's suit was not commenced until November 29, 1901, while the statute of the province required every such action to be "commenced within 12 months after the death of the deceased person," (R. S. O. 1887, c. 135, § 5); thus her suit was begun four days after this period had expired.

[3] Where, then, did the accident happen? Appellants allege in their petition that it occurred in Canadian waters, and Mrs. Workman in her answer denies this. Each side now claims that the burden of proof rested upon the other to show just where the Stewart was at the time of the death; but admiralty rule 54 requires claimants, upon issue of a monition, to appear before the court and "make due proof of their respective claims," etc. We do not see how a death claim can be validly proved without disclosing the place and circumstances of the death. Such a right of action depends solely upon a statute, and no presumption arises as to where the act causing the death was committed; the case would be different in this respect if the right of action existed at common law. Wooden v. W. M. Y. & P. R. R. Co., 126 N. Y. 10, 14, 15, 26 N. E. 1050, 13 L. R. A. 458, 22 Am. St. Rep. 803; Le Forest v. Tolman, 117 Mass. 109, 19 Am. Rep. 400; Burdict v. Mo. Pac. Ry. Co., 123 Mo. 221, 229, 27 S. W. 453, 26 L. R. A. 384, 45 Am. St. Rep. 528; Cuba R. R. Co. v. Crosby, 222 U. S. 473, 479, 32 Sup. Ct. 132, 56 L. Ed. 274, 38 L. R. A. (N. S.) 40. The most that is claimed on behalf of Mrs. Workman is that the "channel is sinuous and crosses many times the boundary line, and the exact spot where the Elwood was is not shown by the evidence." Such an inquiry is attended with inherent difficulties, for no physical objects seem to exist by which the ordinary observer can ascertain the boundary through Mud Lake. The trend of the evidence indicates that the Elwood grounded on the easterly or Canadian side of the channel; and that at the time of the explosion the Stewart was lying on the American side of the Elwood and very close to the boundary line. Upon the whole, we think the conclusion reached by the trial court must be accepted:

"Although the proof is thus indefinite, I think it is to be taken as the fact that the Stewart, at the time of the accident, actually was in Canadian waters."

However, it is to be observed and remembered that the Stewart had been taken from the American side for a temporary object only and with intent to return her without touching at any Canadian port, and that she was brought back to the nearest American port directly after the accident.

[4] Concededly the state suit was begun within the time fixed by the Michigan death statute. Can the right of action in terms preserved to the widow by that statute be enforced? If so, it is because

at the time of the death the Stewart was through ownership and registration domiciled in Michigan and was, as respects the enforcement of such a right, part of the territory of Michigan. So far as this question is concerned, the ultimate basis of the decree was "that the explosion of this boiler was a matter which did not directly involve the 'peace, dignity, or tranquility' of the Canadian government but rather involved the 'internal discipline and management' of the ship." This was regarded as being in accordance with the ratio decidendi in United States v. Rodgers, 150 U. S. 249, 260, 266, 14 Sup. Ct. 109, 113, 116 (37 L. Ed. 1071), in which it was held that the federal courts have jurisdiction, under section 5346 of the Revised Statutes (U. S. Comp. St. 1901, p. 3630), to try a person for a crime "committed on a vessel belonging to a citizen of the United States when such vessel is in the Detroit river, out of the jurisdiction of any particular state, and within the territorial limits of the Dominion of Canada."

Thus the question confronting us is at last narrowed to the inquiry whether, since the act causing the death of Workman occurred on a vessel owned and territorially situated similarly to the vessel involved in the Rodgers Case, jurisdiction extends to the enforcement of a civil liability, like the one urged here. At least two differences, we do not say distinctions, are readily observable between the question decided in the Rodgers Case and the one now under consideration. The charge in the former case was the violation of an act of Congress, entailing, if sustained, a prescribed penalty, while here the claim is that the acts of negligence described entitle the claimant to a right of action under the statute of Michigan. The one concerns criminal responsibility and the other civil liability. Similarity in the two cases in all other material respects is in principle clearly observable. We shall consider the effect of the differences and the similarity mentioned as we progress. We do not dwell at this point upon the rule settled by the Rodgers Case. So far as the question of jurisdiction is concerned, if the Canadian waters in question could be regarded the same as the waters of one of the open oceans, recovery in this case might be warranted by decisions like that of The Hamilton, 207 U. S. 398, 405, 28 Sup. Ct. 133, 134 (52 L. Ed. 264); but that case grew out of a collision at sea, without the territorial jurisdiction of any particular nation, and concerned lost members of the crew of the sunken vessel and claims made on account of their deaths against a fund derived from the Hamilton, under the limitation acts of Congress; Mr. Justice Holmes stating:

"The jurisdiction commonly expressed in the formula that a vessel at sea is regarded as part of the territory of the state, was held, upon much consideration, to belong to Massachusetts," etc.

It is strongly contended that the Hamilton, and the class of cases it represents, are inapplicable because the Stewart was at the time of the accident lying in waters of another nation. The idea, of course, is that the local law of the place of injury and death must govern. No doubt this is the general rule; still, in determining the place of Workman's death, we must not overlook the question whether, in the circumstances of this case, the Stewart was constructively part of Mich-

igan, so far as her "internal management and discipline" were concerned. This cannot be solved by such cases as Smith v. Condry, 1 How. 28, 32, 11 L. Ed. 35, where, in passing upon the rights of two American vessels which had collided at the dock of the port of Liverpool, it was held that certain British statutes enacted for the regulation of pilots conducting ships were controlling. Mr. Justice Nelson said in The Eagle, 8 Wall. 15, 22 (19 L. Ed. 365), when speaking of Smith v. Condry and of other similar decisions, one by Dr. Lushington:

"These are exceptional cases and furnished no rule to the court below for the trial of the collision in question."[3]

We need not recapitulate the great variety of citations employed by counsel to show that the statute of the province of Ontario is controlling. They are not either in the points determined or in principle decisive of the present issue.

We come now to consider the question on its merits. Congress has passed no statute to take a case like Workman's out of the operation of the common-law maxim that personal actions die with the persons. The act of Congress approved June 15, 1836, admitting the state of Michigan into the Union, made the easterly boundary of the state coterminus with "the boundary line between the United States and Canada, through the Detroit river, Lake Huron, and Lake Superior to a point where the said last line touches Lake Superior." Act June 15, 1836, c. 99, 5 Stat. L., 49. It is settled that, where Congress has not acted, a state may, as respects its interests, enact appropriate statutes concerning matters also within the federal power; such laws of course become operative throughout the state, as well upon navigable waters as upon land within its boundaries; and this right of the state includes the power to enact and enforce statutes providing damages for wrongful death. The Hamilton, supra, 207 U. S. at page 404, 28 Sup. Ct. 133, 52 L. Ed. 264; The Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, recently decided by the Supreme Court. Thus the municipal law appertaining to the waters of Mud Lake embraces the statutes of the state of Michigan and the province of Ontario, before pointed out. Both of these statutes were in force at the

---

[3] Judge Denison said: "That local laws will not be controlling where the matter involved has to do with the 'internal management or discipline' of the vessel. Bearing these limitations in mind, it will be seen that the collision and towage cases are not applicable. Smith v. Condry, 1 How. 28 [11 L. Ed. 35]; Bigelow v. Nickerson, 70 Fed. 113 [17 C. C. A. 1, 30 L. R. A. 336]; Humbolt v. Christopherson, 73 Fed. 239 [19 C. C. A. 481, 46 L. R. A. 264]; Robinson v. D. & C. Co., 73 Fed. 883 [20 C. C. A. 86]; Alaska Co. v. Williams, 128 Fed. 362 [63 C. C. A. 92]. Those cases involve the maritime law and the sailing rules of the country having authority over the waters. Not so with the obligation of the owner of the boat to furnish its crew with a safe place to work. This obligation is sometimes, and not improperly, spoken of as an implied contract obligation; but, whether its violation is a matter of contract or of tort, it seems to pertain quite distinctly to the 'internal management and discipline' of the ship. As applied to this case, it is not a matter which concerns the local government, excepting by the indirect connection between the safety of such machinery and the safety of adjacent Canadian citizens and property. Nor is the question between the lex loci and lex fori (as in A., T. & S. F. Ry. v. Sowers, 213 U. S. 68 [29 Sup. Ct. 397, 53 L. Ed. 695]); but only what locus."

time of Workman's death; and we need not repeat that Mrs. Workman's right under the foreign statute was barred, while her right under the domestic statute survived, at the time she commenced her suit.

It is well known that for a time some of the leading admiralty judges of this country, in administering the maritime law, disregarded the limitations fixed by such statutes, as also the maxim that a personal action dies with the person (The Harrisburg, 119 U. S. 199, 205 to 214, 7 Sup. Ct. 140, 30 L. Ed. 358, where the subject was reviewed by Chief Justice Waite); but the effect of the decision in The Harrisburg was to overrule that class of cases. The case so considered by the Chief Justice concerned a suit in rem begun in a federal court of Pennsylvania against the steamer Harrisburg to recover damages for a death caused by the negligence of the steamer in a collision with a schooner in a sound of the sea, embraced between the coast of Massachusetts and the islands of Martha's Vineyard and Nantucket, and within the state of Massachusetts. The offending ship belonged to the port of Philadelphia, where she was enrolled according to the laws of the United States. Both Pennsylvania and Massachusetts had enacted statutes authorizing recovery of damages for death occasioned by negligence, etc.; but the suit in question was brought after the limitation of time fixed by each of the statutes had expired, and the court was satisfied that the suit was begun too late. 119 U. S. 214, 7 Sup. Ct. 140, 30 L. Ed. 358. This is tantamount to saying, as Chief Justice Waite there in substance said, and as the present Chief Justice, when speaking of that case in La Bourgogne, 210 U. S. 95, 138, 28 Sup. Ct. 664, 679 (52 L. Ed. 973), in terms said:

"That no damages can be recovered in admiralty for the death of a human being on the high seas, or on the waters navigable from the seas, caused by negligence, in the absence of an act of Congress, or a statute of a state, giving the right of action therefor."

And this in turn plainly implies that, if there be either such a federal or state statute, damages are recoverable. Since the right of action here has been preserved in Mrs. Workman by the Michigan statute, there is no perceivable reason why the right cannot under the facts of this case be enforced. If that statute were an act of Congress and limited in its operation to the waters of the Great Lakes, navigable rivers, etc., the instant case could not be rationally distinguished from the Rodgers Case.[4] As Congress has chosen to remain silent, the subject-matter of the Michigan statute, both as to lands and navigable waters within its borders, was plainly within the legislative power of the state (Bigelow v. Nickerson, 70 Fed. 113, 117, et seq.,

---

[4] Indeed, under such an act of Congress, the present case would be stronger than the Rodgers Case, for the difficulty in that case was not, as it clearly could not have been under the long-settled rule of the Genesee Chief (12 Howard, 443), either that the admiralty jurisdiction in civil cases did not extend to, or that Congress could not pass an act providing for the punishment of crimes committed anywhere upon the Great Lakes, navigable rivers, etc.; but it was that the Crimes Act then under consideration did not in terms embrace such internal navigable waters. See dissenting opinions in the Rodgers Case.

17 C. C. A. 1, 30 L. R. A. 336 [C. C. A. 7th Cir.]; Chicago Transit
Co. v. Campbell, 110 Ill. App. 366, 370, 371); and there should be
accorded to it the same operation and effect concerning the Stewart
and her location as would be to an appropriate similar act of Con-
gress. In speaking of the vessels passing through the Detroit river,
Mr. Justice Field said in the Rodgers Case, 150 U. S. 260, 14 Sup. Ct.
113, 37 L. Ed. 1071:

"All of them, however, so far as transactions had on board are concerned,
are deemed to be within the country of their owners. Constructively they
constitute a part of the territory of the nation to which the owners belong.
Whilst they are on the navigable waters of the river they are within the ad-
miralty jurisdiction of that country. This jurisdiction is not changed by the
fact that each of the neighboring nations may in some cases assert its own
authority over persons on such vessels in relation to acts committed by them
within its territorial limits. * * * The general rule is that the country to
which the vessel belongs will exercise jurisdiction over all matters affecting
the vessel or those belonging to her, without interference of the local govern-
ment, unless they involve its peace, dignity, or tranquillity, in which case it
may assert its authority. Wildenhus' Case, 120 U. S. 1, 12 [7 Sup. Ct. 385,
30 L. Ed. 565]; Halleck on International Law, c. 7, § 26, p. 172."

The pertinence of this language to the case in hand is obvious;
and it scarcely need be said that in giving effect to the Michigan stat-
ute it is not meant to say that the legislation of a state, any more than
that of Congress, can in terms be given extraterritorial effect; it is
only meant to say, as we have just pointed out in the Rodgers Case,
that vessels situated like the Stewart *constructively* "constitute a part
of the territory of the nation to which the owners belong." It is
manifest that such a constructive extension of territorial sovereignty
as to matters occurring on board a ship domiciled and situated as
the Stewart was, and not involving the peace, dignity, or tranquillity
of the nation in whose waters she was lying, rests upon the necessities,
not to say the comity, of nations whose conventional boundaries ad-
join in navigable waters. This is well illustrated by a portion of the
opinion below:

"If the proper conclusion in this case was doubtful, I should hesitate to
decide that the existence of this liability depended upon a few minutes of time
or a few feet of distance, as would be the case with a vessel situated nearly
upon the line and frequently crossing and recrossing; or that upon this sub-
ject there could be one rule upon the Stewart and another rule upon the Mer-
rick; or that there might be one rule forward and another aft, on the same
boat."

The cases of Robinson v. Detroit & C. Steam Nav. Co., 73 Fed.
883, 20 C. C. A. 86 (C. C. A. 6th Cir.), and Wingert v. Circuit Judge,
101 Mich. 395, 59 N. W. 662, are not applicable. It distinctly appears
that the persons on account of whose deaths suits were brought in
those cases were drowned in Canadian waters, and the questions we
have here considered did not arise and of course were not determined
in either of the cases.

[5] 4. The last objection concerns the interest and the costs as
allowed below. The award made in favor of Mrs. Workman was
$3,500 and that of McGregor $3,000, both as of the date of the com-
mencement of their respective suits, and interest thereon at 5 per

cent. from the time of the accident until the date of the decree. Counsel for appellants admit that, "in cases involving the destruction of specific property, interest may, in the discretion of the court or jury, be awarded to the plaintiffs," but they claim that this cannot be done "in actions based only upon injuries to the person, including death claims"; reliance being placed on cases cited in the margin.[5] If the rule of these decisions as applied to ordinary cases at law for tortious personal injuries not resulting in death were conceded, it would not follow that the rule should be applied to the claim of Mrs. Workman. Her claim, as we have seen, is based upon the death act of the state of Michigan, and we are unable to see any reason why the rule of the court of last resort of the state should not be controlling as to the construction of that statute. In Larsen v. Home Telephone Co., 164 Mich. 295, 324, 129 N. W. 894, 905, it was held with reference to a death claim:

"The accident occurred September 1, 1906. The verdict was taken on or about July 20, 1909. It was in terms for $9,000 damages and $1,312.50 interest, for which sums judgment was rendered. It may be said that a more accurate computation would be to estimate the damages suffered to the date of the verdict and add to it the present value of prospective damage, but the difference would be small. The damage supposed to have been recovered was the then present value of the contribution that deceased would have, as of the date of the judgment, made to the widow and children had he lived. They were entitled to that sum when he died, and where the present value was fixed as of that date, as it would seem that it was in this instance, we see no reason for omitting interest to the date of the judgment."

Although one feature of the opinion in which this language is found was not concurred in by the majority, yet all the judges did concur "in the allowance of interest." 164 Mich. 328, 129 N. W. 906. It may be remarked that the measure of damages under the death act, as distinguished from the survival act, of Michigan is uniformly "confined to those damages which are capable of being measured by a pecuniary standard" (Cooper v. L. S. & M. S. Ry., 66 Mich. 261, 271, 272, 33 N. W. 306, 314 [11 Am. St. Rep. 482]; Kyes v. Valley Telephone Co., 132 Mich. 281, 283, 284, 93 N. W. 623); the rule being to fix upon a 5 per cent. basis the present worth of the ascertained annual contribution that the deceased, if he had lived, would during his expectancy have made in favor of the beneficiary (Rivers v. Traction & Electric Co., 164 Mich. 696, 708 to 710, 128 N. W. 254, 131 N. W. 86). Since it was held in the Larsen Case, supra, that the beneficiaries were entitled to that sum at the time of the death and to interest to the date of the judgment, it would seem that the recoverable amount was in effect treated as in the nature of a debt.

Concededly the measure of damages thus pointed out is not applicable to McGregor's claim, and this is true in Michigan as else-

5 Burrows v. Lownsdale, 133 Fed. 250, 251, 66 C. C. A. 650 (C. C. A. 9th Cir.); Railroad v. Wallace, 91 Tenn. 35, 17 S. W. 882, 14 L. R. A. 548; Ortolano v. Morgan's L. & T. R. & S. S. Co., 109 La. 902, 911, 33 South. 914; Cochran v. Boston, 211 Mass. 171, 172, 173, 97 N. E. 1100, 39 L. R. A. (N. S.) 120, Ann. Cas. 1913B, 206. To the same effect is the recent decision in Penny v. Atlantic Coast Line R. Co. (N. C.) 77 S. E. 774.

where (Cooper v. L. S. & M. S. Ry., supra, at page 271 of 66 Mich., 33 N. W. 306, 11 Am. St. Rep. 482); but this is only to say that some elements of damages, like those of mental and physical suffering, should be added in the ordinary common-law case for tortious personal injury. Our attention has not been called to any case in admiralty in which the question of interest upon a claim like McGregor's has been considered, except Burrows v. Lownsdale, supra, and there interest was denied. And yet it is not easy to distinguish effectively between the admitted principle which allows interest in respect of an unliquidated claim for a tortious injury to property and that which would deny a similar allowance as part of an unliquidated claim for a tortious injury to the person, for the ordinary theory of debt and demand of payment is seemingly as difficult to perceive in the one instance as in the other.[6] However, we need not decide the question, because (1) denial of interest could in any event be made only against McGregor, and (2) the evidence satisfies us that he was entitled to recover as damages substantially as much as the sum assessed, with interest, in his favor. No prejudicial error, then, was committed by his allowance of interest if, indeed, this was error at all; and while, in view of the settled rule that an appeal to this court in an admiralty proceeding brings the case under review upon both the law and the facts (City of Cleveland v. Chisholm, 90 Fed. 431, 434, 33 C. C. A. 157 [C. C. A. 6th Cir.]; The San Rafael, 141 Fed. 270, 275, 281, 72 C. C. A. 388 [C. C. A. 9th Cir.]; Loveland, App. Jur. § 181, and citations), we might formally increase his damages in the sum indicated, it could serve no meritorious end to do so. This case was pending

[6] The rule in admiralty concerning the allowance of interest on damages (true, damages to the value of a ship) was never stated more clearly than it was in The Scotland, 118 U. S. 507, 518, 6 Sup. Ct. 1175, 30 L. Ed. 153, where Mr. Justice Bradley said: "Were the libelants entitled to interest on the amount received from the strippings? In answering this question it must be borne in mind that this is not a question of debt but of damages. The limitation of those damages to the value of the ship does not make them cease to be damages. The allowance of interest on damages is not an absolute right. Whether it ought or ought not to be allowed depends upon the circumstances of each case and rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury." The rule was stated in effect the same by Mr. Justice Brown in The Albert Dumois, 177 U. S. 240, 255, 20 Sup. Ct. 595, 44 L. Ed. 751; by Judge Taft, speaking for this court, in The North Star, 62 Fed. 71, 87, 10 C. C. A. 262; by Judge Severens, speaking for this court, in Great Lakes Towing Co. v. Kelly Island L. & S. Co., 176 Fed. 492, 498, 100 C. C. A. 108; and by Judge Addison Brown in The North Star (D. C.) 44 Fed. 492; The Alaska (D. C.) 44 Fed. 502. Instructive discussion as to the allowance of interest on damages arising in cases of tort generally may be found in Frazer v. Bigelow Carpet Co., 141 Mass. 126, 128, 4 N. E. 620, by the present Mr. Justice Holmes, although the rule there laid down is not extended to personal injury cases in Massachusetts (Cochran v. Boston, supra); also in Nashua & Lowell R. Corp. v. Boston & Lowell R. Corp., 61 Fed. 237, 250, et seq., 9 C. C. A. 468, by Judge Putnam. See, also, District of Columbia v. Robinson, 180 U. S. 92, 107, 21 Sup. Ct. 283, 45 L. Ed. 440; Drumm-Flato Commission Co. v. Edmisson, 208 U. S. 534, 539, 28 Sup. Ct. 367, 52 L. Ed. 606; Taylor v. Railway Co., 101 Mich. 141, 145, 146, 59 N. W. 447.

about eight years before trial was had below and should be brought to a close.

The decree must be affirmed, with costs of this court, including costs below as therein taxed.