## THE PROCIDA.

(District Court, S. D. New York. March 3, 1917.)

1. COLLISION ⬦⟶95(2)—VESSEL IN TOW—FAULT OF TUGS.

Three tugs were engaged in taking a steamship from dry dock in Erie Basin to a berth outside. In passing from the basin, one was in the lead with a hawser, another was made fast to a quarter, and the third, for the proper execution of the maneuver, should have acted as rudder by hanging to the stern with a line until the ship had passed through the entrance, but, instead of doing so, it made fast by three lines to the other quarter, and the ship, having no motive power of her own at the time, came into collision with some barges alongside another vessel. *Held*, on the evidence, that the third tug alone was in fault, and liable for the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202.]

2. COLLISION ⬦⟶16—TUGS CO-OPERATING IN HANDLING TOW—DUTIES.

When several tugs are co-operating in the movement of a ship, it is the duty of each to obey the orders of the one in control of the operation, and to assume that the others will render proper assistance.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 15.]

3. COLLISION ⬦⟶115—LIABILITY OF TOWING CONTRACTOR FOR NEGLIGENCE.

While tugs are liable in tort for a collision through their fault, by which their tow is injured, the contractor, who has undertaken to render

---

⬦⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the service, may also be liable personally for failure to properly perform his contract. .

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244–247.]

4. COLLISION ☞115—INJURY TO TOW—LIABILITY—MASTER OF TUG ACTING AS PILOT.

Respondent contracted to move a steamship from one berth to another, and for the purpose used one tug owned by him and two which he hired. The operation was under the direction of the master of his own tug, who, as customary in the port, also went on board the ship and acted as pilot, for which he was paid $5 by the ship. Through his negligence and the fault of one of the hired tugs there was a collision, in which the ship was injured. *Held*, that the fact that the ship was required to have a pilot did not make such pilot her agent, in such sense as to relieve respondent of liability for his negligence.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244–247.]

In Admiralty. Suit by the Navigazione Generale Italiana against Edward M. Timmins and the tugs McCaldin Bros. and Edward G. Murray for collision with the Procida. Decree for libelant against the Murray and respondent Timmins.

The libel is for a collision between the Procida, while in tow of three tugs, and certain barges alongside the steamer Winnebago in the Erie Basin. The Procida had been in dry dock and was without steam; she wished to go to her berth in the North River, and for that purpose she called up the respondent Timmins and asked to be taken by tugs from the Basin to her destination. Timmins sent his own tug, the J. J. Timmins, and hired the McCaldin Bros. and the Edward G. Murray, each belonging to another owner. On arriving, Keene, the captain of the J. J. Timmins, ordered the Murray to put a line on the Procida's stern and pull her out into the Basin, and then to come alongside on the port quarter, either after the Procida had left the Basin or as soon as she was pulled out into the Basin (which of these was the order is in dispute). Keene next made his own tug fast to the starboard quarter of the Procida and went on the bridge. The Murray pulled the Procida out stern first, till she was about 125 feet clear of the dry dock, and then straightened her out to be pulled through the mouth or Gap of the Basin to the river. Keene then ordered the McCaldin Bros. to lead the flotilla with a hawser, which she did, being at the time of the collision the only vessel under way. At some period not altogether certain, but a substantial time before the collision, the Murray came alongside the Procida on her port quarter and made fast with three lines. Thus, as the flotilla approached the Gap, the McCaldin led and the other two tugs flanked the Procida's quarters. The Winnebago and her outlying barges the Procida would have passed safely to port, except for reasons not altogether clear, necessarily resting, however, in faulty navigation of some kind, because there is no tide in the Basin and the wind was light. Instead of this, the Procida was allowed to sag to port, and touched her port quarter about 150 or 125 feet from her stern, with enough momentum to break in one of her plates and do much damage to her newly installed refrigerating plant. Just before the collision the Murray, seeing herself likely to be crushed between the barges and the Procida, slacked the backing line to the steamer and fell back till the Procida's headway had been stopped. After the collision the Murray resumed her position, and the flotilla passed through the Gap without further accident, where it was met by a fourth tug, with which all vessels went to the Procida's berth in the North River.

Keene sent a bill to the steamer for $5 as payment for his services for pilotage on the day in question, and this was paid in addition to $120 charged for the hire of the tugs. It appears that the practice of charging and paying $5 to the captains of tugs, who go upon the bridge of steamers under such

conditions as these, is universal in the harbor. If there be a pilot proper on the steamer, no tugboat master goes on the bridge.

Homer L. Loomis, of New York City, for the Procida.
Chauncey I. Clark, of New York City, for the J. J. Timmins.
T. Catesby Jones, of New York City, for the McCaldin Bros.
James A. Martin, of New York City, for the Murray.

LEARNED HAND, District Judge (after stating the facts as above). [1] It is the universal testimony in the case that proper navigation under the circumstances was for the Murray to act as rudder for the ship and hang on at the rear on a hawser till the flotilla had emerged from the Gap. Even Delamater, the Murray's captain, admits this, and gives as his excuse only his orders from Keene. The failure to observe this method was the direct cause of the collision, and in my judgment the sole cause, and those tugs which shared in it are certainly at fault. The Murray's fault is the most obvious, because she was clearly out of position, as her own master concedes. Her excuse is twofold—that she acted under orders, and that the fault was that of McCaldin Bros. As to the first, she had no right to surrender herself to improper orders, and she is liable in tort if she did. The Anthracite, 168 Fed. 693, 94 C. C. A. 179. She might, it is true, have remained in a position where she could have nosed off the Procida, if need arose; but she could not do this with three lines out, and I can therefore see no excuse for her.

[2] The McCaldin Bros. was not at fault. Her hard astarboard wheel is complained of, but I think unjustly. She allowed the bows of the Procida to come very close, perhaps too close, to Beard's Stores before she changed her wheel; but that was not her fault. It cannot, of course, be possible for each tug to use her own discretion, or the whole command disappears. When she did starboard, she starboarded hard, which was all she could have done. Though it was obvious then, as Howe concedes, that the Murray must nose off the stem, he had the right to assume that the Murray would do so. It would violate the very foundation of good seamanship for the McCaldin Bros., by speculating on her own account, to vary from the orders received. The only possible liability is from entering the maneuver with the Murray in the wrong position. As to that, I think that it has not been proved that, when the McCaldin Bros. started ahead on the hawser, the Murray was already alongside the Procida. The Murray's mate says that was after the flotilla was under way. If so, I do not think a tug is at fault which, though she is herself in proper position, fails to stop a maneuver of which she has no charge or direction, because she sees that another tug has changed to an improper position. Obviously this would be impossible under most circumstances, because it would be much more dangerous to abandon the maneuver already under way than to go on. While I am not sure that the McCaldin Bros. could not have stopped without danger, I am not sure that she could. It can only be in the clearest case that a tug is bound to break up such a maneuver once started. No doubt, instances can be put where that would be her duty; but I do not think that this is one. It always remained possible

for Keene to direct the Murray to nose away the stem if it became necessary. There is no evidence that Howe saw that the Murray had out three lines. The position of the Murray was not so obviously perilous to the Procida as to call for such extreme conduct. Therefore I find the McCaldin Bros. without fault.

[3] The liability of the tug J. J. Timmins needs no consideration. Not only was she not at fault in any respect, being where she should have been, doing all that was required of her; but she has not even been sued. The libel is against Edward M. Timmins personally, and he has not yet limited his liability. While the liability of the tugs in such a case is in tort, and they must be found at fault (The W. G. Mason, 142 Fed. 913, 918, 74 C. C. A. 83), Timmins personally undertook to perform the towage service for the Procida, and his personal liability, whether it sounds in contract or in tort, does not depend upon the misconduct of his tug, taken as a mere instrument of navigation. That liability—the question of limitation may await its exercise—depends, first, upon whether Keene performed the obligation undertaken by Timmins to transport the Procida safely from berth to berth; and, second, whether his negligence, if any, in that performance, may be imputed to Timmins. As to Keene's personal fault, I think it is proved, whether he ordered the Murray to go alongside inside or outside the basin. If he ordered her to go alongside while she was still inside the basin, no more need be said; if he did not, he was liable for failing to enforce his orders. On his own statement, he knew that the Murray was alongside for some time before the collision occurred, long enough to make use of her. The evidence is not contradicted that she came alongside soon after the McCaldin Bros. began to tow; just when it is quite impossible to tell. Salvadori's testimony, on which Mr. Clark relies to show that her change of position was a surprise, refers to her slacking off and falling back at the moment of collision. She had had time to put out two added lines and take in her original towing line, and she must have been alongside, in my judgment, at least five minutes. The most reasonable assumption is that, as soon as she finished towing, she turned about and came up, and, as the motion of the Procida was at all times very slow, it is apparent that she must have got there a substantial time before the flotilla reached the Gap. Of course, she did not start behind as a rudder, and change her mind in the midst of affairs and come up. Whether she followed orders, or mistook orders, she meant always to go alongside at once, and that she did. This being assumed, it follows that Keene was not keeping a watch upon his vessels, or he would have seen her in season, assuming he did not. Nothing prevented his stopping the McCaldin Bros., and, if necessary, stopping the Procida, too, until the Murray took her right place. His failure strongly suggests that he had ordered her there at the outset, as does the fact that she resumed her position after the collision, but before the flotilla had passed the Gap. His judgment to allow her to continue her position was not in extremis; the wind was light, there was no tide, the Procida's motion was very slow, and there was no other shipping in motion; he had ample time and space.

[4] The last question is whether Timmins is responsible for Keene's negligence. Had Keene given his directions from the tug, no question could arise. Had he, for his own convenience and without any request, gone on the bridge, it would be the same. The fact which causes any doubt is that he was paid $5 as a pilotage fee, and that he says he was asked to go upon the bridge; evidence which I accept in the sense that it was expected that he should, and that the situation amounted to an invitation. Whether he was actually asked to come on board and be the pilot, I do not decide. Judge Holt held, in The Leader (D. C.) 166 Fed. 139, that the tug of such a master was not liable, and, indeed, he could not have held otherwise, because the tug was not at fault. He did not hold that, if the "pilot master" had been sent by the tug's owner to "transport" the Russian Prince, the owner would have been without liability. This distinction is fundamental (The Syracuse [C. C.] 36 Fed. 830), and amply explains Judge Holt's decision. Keene was Timmins' agent, deputed for the express purpose of performing the obligation. To succeed, the respondent must maintain that, by the payment and the invitation, the Procida meant to release the principal from his obligation, and to accept the agent to perform on his personal account for them. Regarded merely as a matter of contract, and so of intention inter partes, there can be no doubt that by accepting Keene as pilot the Procida never meant anything of the kind. They had employed Timmins to transport the vessel, and Keene came as Timmins' agent. He was Timmins' choice, not theirs, and the mere fact that they paid him certainly did not signify any purpose to accept him in place of his principal. Rather the ship must have meant to hold both principal and agent for any negligence. Judged, therefore, by principles of common law, the supposed release of the respondent is untenable.

However, it is insisted that, regardless of intent, the requirement that the Procida should have a pilot imposes him upon the ship for all purposes, and imputes to the ship all consequences of his negligence. This is supposed to follow from The China, 7 Wall. 53, 19 L. Ed. 67, and the cases following The China. That doctrine has been misapprehended; it depends altogether upon the theory of the admiralty that the ship may be regarded as itself a wrongdoer (reus). That theory, moreover, applies only when the question is of a maritime lien for tort, and of process in rem appropriate for such liens. The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954. Where the legal relations are necessarily personal, and no question can arise of a maritime lien, or of a res as wrongdoer, the owner is not responsible for the conduct of a compulsory pilot. Homer Ramsdell Co. v. Comp. Gen. Trans., 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155. This case, arising upon a personal obligation against Timmins, depends only upon the intention of the parties. So regarded, Keene's negligence will not be imputed to the libelants, even though a lien might have arisen against the Procida, had the Standard Oil barge been injured.

The decree will therefore go against the Murray and Timmins equally up to the value of the Murray, and against Timmins for the balance, unless he shall limit his liability.