## THE BEAVERTON.

## THE DAISAI MARU.

(District Court, S. D. New York.  July 28, 1919.)

1. **International law ⬾10—Vessel under charter to foreign government not immune from arrest.**

   The fact that when a libel in rem was filed against a vessel she was under charter to a foreign government, but not in its possession, *held* not to render her immune from arrest.

2. **Collision ⬾71(2)—Anchored vessel not in fault for collision with moving vessel.**

   A vessel properly anchored on anchorage grounds in the daytime in calm weather *held* not in fault for not taking measures to prevent a collision with a moving vessel in charge of four tugs until it became clear that the other vessel was not under control and that there was danger of collision.

3. **Collision ⬾71(1)—Tugs maneuvering ship exonerated from fault.**

   Four tugs, engaged in moving a steamship on anchorage grounds under direction of her pilot, *held* not chargeable with contributory fault for collision with an anchored vessel, where the fault of the ship, through her pilot, in attempting the maneuver she did, in view of the state of the tide, was clear.

4. **Collision ⬾62—Tugs not jointly liable, where acting under direction of ship.**

   The rule that tugs engaged in moving a ship may be chargeable with fault for a collision, where they join in a maneuver which they know to be improper, applies when the tugs are jointly co-operating and sharing in the general direction of the maneuver, or by mutual agreement delegate their common duties to one, but does not apply where they are all operating under the orders of the ship, without assuming any responsibility for the means or the result.

In Admiralty.  Suit for collision by the Canada Steamship Lines, Limited, as owner of the Steamship Beaverton, against the steamship Daisai Maru, with others impleaded.  Decree against the Daisai Maru.

Barry, Wainwright, Thacher & Symmers, of New York City, for libelant.

Hunt, Hill & Betts, of New York City, for the Daisai Maru.

Burlingham, Veeder, Masten & Fearey, of New York City, for underwriters of the hull.

Herbert Green, of New York City, for steam tug John Nichols.

Foley & Martin, of New York City, for steam tugs N. B. Starbuck and Edith.

Harrington, Bigham & Englar, of New York City, for steam tug A. W. Smith.

LEARNED HAND, District Judge.  [1] I have delayed the decision in this case for five months, hoping that the Supreme Court, in The Gleneden, 254 U. S. 522, 41 Sup. Ct. 185, 65 L. Ed. ——, would settle the question of the Daisai Maru's immunity from arrest on December 22, 1917.  That is the critical date, because the libel was then filed, and it is clear from the stipulation that the libelant held off the

arrest at the request of the proctors for the Daisai Maru. At that time she was merely under charter to the French republic, not in its possession nor owned by it, though both facts changed within a few days. However, the Circuit Court of Appeals on May 14, 1919, in The Carlo Poma, 259 Fed. 369, 170 C. C. A. 345, decided that the test of immunity was the possession of the foreign sovereign, not its ownership. A fortiori the relation of charterer will not give immunity. It is true that, strictly speaking, the decision in The Carlo Poma, supra, was only that, when both ownership and possession co-existed, the ship was immune; it was not necessary to say that possession was the test.. However, the opinion is a distinct declaration of the law by a tribunal whose word is authoritative upon me, and it seems to me undesirable any longer to delay decision, since upon an appeal my error, if any, may be corrected, if the Supreme Court shall have decided that the test is whether the ship is engaged upon a venture of a foreign sovereign which will be impeded or frustrated by arrest.

I proceed, therefore, to the merits. That the Daisai Maru is prima facie at fault is of course accepted by all sides; she was a moving vessel in collision with an anchored. The only questions open are, first, whether the Beaverton was also at fault; second, whether the tugs share the blame with the Daisai Maru; third, whether the towing company is also liable, if the tugs be liable.

[2] The Beaverton's supposed fault consists of no more than failing to observe in season the approach of the Daisai Maru and to veer chain. Kennedy was at the forecastle head of the Beaverton, at work coiling ropes, etc. While he was in no sense an anchor watch, it was not as though no one had been on deck. He could and did see the approach of the Daisai Maru, and did not suppose, at first, as no one did, that she would endanger the Beaverton. Normally she would not, and certainly she should not, have done so. It was only when she was about a length or more away that he observed that she was not under control. I am not disposed to scrutinize too nicely his conduct, and to treat the case as though he was bound to keep a sharp lookout. The Beaverton was at anchor on an anchorage ground where she had the right to be; the weather was fair and calm and reasonably clear; the Daisai Maru was scarcely under way and in charge of four tugs, an unusual number under the circumstances.

The suggestion that such a situation demands anything in the nature of continuous observation appears to me extreme. Lind v. Penn. R. R., 139 Fed. 233, 71 C. C. A. 359. An anchor watch is not an absolute necessity in broad daylight and fair, calm weather. Wells v. Armstrong (D. C.) 29 Fed. 216; The Rockaway (D. C.) 19 Fed. 449. Kennedy's presence at the forecastle head, his observation of the Daisai Maru out of the tail of his eye, were quite all that was to be expected. Had he ever given up his work and kept his gaze fixed on her, it is doubtful whether he would have found occasion for action sooner than he did. I will assume that he might, for it would in my judgment make no difference. He was not bound to take such action towards a vessel which threatened so little danger.

As soon as he did observe that she was not under control, he did all

that he could, by calling his chief officer, who at once gave orders to veer chain. It is clear that these orders were carried out with all proper expedition. Whether the chain in fact paid out at once is a matter of some doubt; but it is immaterial, because, if it did not, it was because the Beaverton was at the moment riding forward on her chain through some trick of the tide, which I own seems to me questionable, but which nevertheless may have happened. In any aspect, I cannot see how the Beaverton, an anchored vessel, in apparent safety, with every means to be avoided, can be charged with joint fault in what certainly was a strangely unjustified collision. I hold her, therefore, free from fault.

[3] There remains, therefore, the apportionment of fault between the Daisai Maru and her tugs, which were the only wills that set her in motion. Feldhusen was the Daisai Maru's pilot, regularly employed by the ship as such, for whose faults, under the rule ever since The China, 7 Wall. 53, 19 L. Ed. 67, she was absolutely responsible. I shall therefore speak of him as though for the time he were the ship itself. He was a young man of some two years' experience as a qualified pilot, who impressed me on the stand as straightforward and reasonably intelligent, but without great force of character. When he arrived at Brady's dock, he found that three tugs had been ordered, to which later a fourth was added. The ship was not under steam— except for her winches, etc.—and it was necessary to rely wholly on the tugs. His purpose was only to move her out to the anchorage grounds, to a safe berth outside the Beaverton. South of the last, and about a length or two away, say 600 feet, lay the Chippana, and north of her another unknown vessel, about the same distance astern. Except for the Java which was docking at the north side of Brady's dock when the Daisai Maru emerged, there was no other shipping in the vicinity. It was Feldhusen's purpose to take the Daisai Maru between the Beaverton and the Chippana, in doing which he necessarily reckoned on the absence of any current, for the space was not great.

I think that he had to choose between three alternatives, although the testimony is in some conflict: First, to do as he planned; second, to go across the bows of the Chippana, the safest way; and, third, to go astern of the Beaverton, which would have been possible, had he waited till the Java had docked, or at least so it seems. All three of the anchored vessels were about 1,000 feet off the pier end, and he had therefore ample room to turn the Daisai Maru. I find that he did not disclose to any of the tugs just which course he was going to take, though he did say that he was going to take her out to a berth on the anchorage.

The disposition of the tugs was as follows: The Nichols, which was the most powerful, was on his port bow; the Starbuck, the next most powerful, on a hawser leading the Smith on the starboard bow and the Edith on the starboard quarter. There is some controversy as to whether Feldhusen ordered the Edith to where she actually went, or alongside the Nichols, on the port bow. Her actual order came from Wray, the Nichols' master, who says he got it from Feldhusen, which Feldhusen denies. It seems to be more probable that Wray did not undertake to place the Edith on his own responsibility than that Feld-

husen should now have forgotten what he told Wray. Therefore I find that the Daisai Maru has not proved that Wray gave an unauthorized order to the Edith. I also find that the Nichols had out only one line. Much the most reliable evidence is to that effect, and it is extremely unlikely that, knowing, as he did, that he might be expected to hold up the Daisai Maru, he should have had two. The issue is perhaps immaterial, in view of the admitted fact that the Nichols later was angling at least four points on the Daisai Maru, and must therefore have thrown off any towing line, if she started with one.

The start was made at about 11 a. m., at what Feldhusen supposed was slack water, but what later proved to be a substantial set of the flood. This in my judgment was the first and much the most serious fault, and it seems to me without excuse. High water that day at Governors Island was at 11:24, and at Bay Ridge, 15 minutes earlier. At Brady's dock it was about 11:10, and Feldhusen was right, therefore, in choosing his time, if he meant only to get high water. Unfortunately the surface currents remain flood for a long time after the ebb has set below the surface. At the locus in quo the tide tables show that in mid-channel the surface flood runs for well over an hour after high water. The Daisai Maru was subject to a substantial flood on the surface, probably quite a knot in speed, and diminishing to slack, or perhaps the turn of the ebb, some 15 feet below. It was this surface current which in fact made the passage between the Beaverton and the Chippana hazardous, must too hazardous for prudent seamanship.

Moreover, Feldhusen was chargeable with knowledge of these conditions. I do not forget that the tide tables speak only of mid-channel, and that conditions on the anchorage grounds may be different. The position of the Beaverton, 1,000 feet off Brady's dock, was slightly less than one-half way to mid-channel, and certainly it would have been grossly careless, if the surface flood was running over a knot in mid-channel, to assume that there was none halfway inshore. I need cite no authorities to show that a licensed pilot is charged with knowledge of exactly such conditions as these. By his own admission it was negligent to try the maneuver which he did, unless at slackwater, and he stands, therefore, in my judgment, clearly at fault.

Did any of the tugs share that fault? I may dismiss any claim against the Starbuck, the Smith, or the Edith, without much discussion. The Edith, I have found, took her position at Feldhusen's direction, through Wray, and she got no orders, except to push the stern upstream, which certainly indicates that some flood was thought possible. It would have tended to keep the Daisai Maru head to the tide. Those orders Feldhusen says he did not give; in fact, they came from Wray. But I hardly can think he initiated them. At least I cannot say that she is shown at fault. The Smith merely followed Feldhusen's directions, and he has admitted she was not at fault. There is some question about the orders given the Starbuck. Both her master and Feldhusen agree that she was at one time directed to stop; but they differ as to when it was. Her master says she was given more than one order to stop, and she probably did stop more than once. It is certain that she was told to pull for the Chippana, and this she did.

While I agree that there is some confusion in the several versions, and that it is strange to suppose that she was given any orders to stop after the Daisai Maru's stern cleared the pier end, still I cannot find any clear evidence that she was at fault, and I must accept in any case Feldhusen's exoneration of her after the collision.

There remains only the Nichols, which is sought to be charged on two grounds: First, that she did not push at right angles; second, that Wray associated himself in a maneuver which he knew to be improperly planned. The Anthracite, 168 Fed. 693, 94 C. C. A. 179; The Procida (D. C.) 243 Fed. 251. It is pretty clear that, when the bow of the Daisai Maru emerged from the dock the Nichols fastened herself alongside. It is also clear that later she was doing her best to nose the Daisai Maru up against the flood, which was unexpectedly found to be carrying her upstream. I find that the Nichols was dilatory in executing her orders, and the only question is whether she should have angled more against the ship. It must be confessed that the immense weight of the testimony is that she never got perpendicular, as she should have been, and as Wray says she was. In the face of their testimony, and in consideration of the inevitable bias of Wray, the single witness, I find she did not come to right angles with the Daisai Maru. I find she did not cast off sooner than she ought for her own safety; but the fact remains that she was not using her own strength to the most advantage.

Shall she be held responsible for that? The case is not one in which some statutory or other sailing rule has been violated, and in which the burden rests upon the vessel so at fault to clear herself by showing that no damage resulted. I think the burden remained upon the Daisai Maru to show that the Nichols, failing to push at right angles, contributed to the collision. The facts are somewhat uncertain, but I cannot say that the result of her change in position would have avoided the collision. Wray is concededly a master of large experience and competence; he knew, after the flotilla was out, what the conditions were which he had to meet, and he undoubtedly meant to do the best he could. The other witnesses, who say that the Nichols was never at an angle of more than 45 degrees, are not to be taken literally. Some of them are biased, as, for example, Feldhusen and perhaps Barlow, who was an officer of the Daisai Maru, and possibly some of the Japanese crew. Just what the Nichols' angle was to the ship I cannot say, except that she was not pushing straight against her.

It is obviously impossible to ascertain what was the differential of power between what she should have done and what she did do, or what the effect would have been, had she been straight. That the Daisai Maru would have cleared the Beaverton, or even that the force of the blow would have been less, seems to me unlikely. Consider the situation. The time would in any case have come when the Nichols must cast off, unless she could have pushed the Daisai Maru far enough below the bows of the Beaverton to leave room for herself to pass safely. If not, she was bound to back off, on which the Daisai Maru would have drifted down on the Beaverton's bows, with a momentum increased by her increased speed. I have no reason to suppose that the

change of an angle would have pushed the Daisai Maru 100 feet below the Beaverton's bows. So much space was necessary, and more, for the Nichols is 96 feet over all, and some allowance must have been made to clear the Beaverton's chain. I would say that the Nichols safely required 150 feet. It seems to me that in the face of the obvious fault of the Daisai Maru, which I can fairly call gross, I ought not to hold the tug for this collision, upon what after all must be admitted to be a speculative inference.

[4] There remains the alleged fault of Wray in becoming a party to a maneuver which he knew to be improper. The Anthracite, supra, asserts this rule in the case of two co-operating tugs, and I applied it in The Procida, a case not yet passed upon in the Circuit Court of Appeals. It applies, in my judgment, when the tugs are jointly co-operating, sharing in the general direction of the maneuver, or by mutual agreement delegating their common duties to one of their number. It does not apply when they are all operating under the orders of the ship, and not among them, either jointly or severally, assuming any responsibility for the means or the result. Here the pilot was the ship; the tugs had nothing to do with their own orders or disposition; they were entitled, and indeed bound, to do what the ship directed.

Furthermore, Wray says, and it is not contradicted, that he did not know what course Feldhusen proposed to take until they had left the dock, when certainly it was too late to change. I do not see how he could have known. It will be urged that he said that the disposition of the tug was wrong in either of the two courses open to Feldhusen; that is, whether the ship was to cross between the Beaverton and the Chippana, or whether she was to head into the tide. That, perhaps, is the fair purport of his opinion, though it is by no means clear. He was opinionated, conceited, and garrulous, and was anxious to show his superiority to the young pilot who had suffered his first mischance. The counsel, properly enough playing upon his failing, led him into a general condemnation of the disposition of the tugs from any point of view.

The consequence of their position would be that no tug can safely accept orders from a ship before she learns exactly what is the proposed maneuver and assents to the methods by which it is proposed to carry it out. I cannot see that this is in any sense involved in the rule of The Anthracite and The Procida; but, if it be, I can only say that the rule is not to be followed with consistency. Such a rule would be totally impracticable in practice. Ships are not to be required to take their tugs into preliminary council of deliberation. Moreover, it is to be remembered that, if this be true, all tugs are liable, for each master is chargeable with knowledge of the proper way to discharge his duties. That conclusion appears to me a reductio ad absurdum.

The sole cause of the collision appears to me to be the mistake of Feldhusen, as he in substance admitted shortly after its occurrence.

The usual interlocutory decree against the Daisai Maru will pass.